510 So.2d 387 (1987)
PEACOCK'S, INC., et al., Plaintiffs-Appellees,
v.
SHREVEPORT ALARM COMPANY, et al., Defendants-Appellants.
No. 18657-CA.
Court of Appeal of Louisiana, Second Circuit.
June 10, 1987.
Rehearing Denied July 9, 1987.
Writs Denied October 16, 1987.
*390 Cook, Yancey, King & Galloway by Sidney E. Cook, Herschel E. Richard, Jr. and Lisa D. Conly, and Wilkinson, Carmody & Gilliam by Arthur R. Carmody, Jr., Shreveport, for Underwriters Laboratories, Inc., defendant-appellant.
Bodenheimer, Jones, Klotz & Simmons by G.M. Bodenheimer, Jr., Shreveport, for Shreveport Alarm and Continental Ins., defendant-appellant.
Nelson & Achee Ltd. by Roland J. Achee, Shreveport, for J.J. Gumberg, Inc., Saul Elinoff, West Penn Emp. Profit Sharing Plan and Northbrook Prop. & Cas. Ins. Co., defendants-appellants.
Davenport, Files & Kelly by William G. Kelly, Jr., Monroe, for J.J. Gumberg, Inc., Saul Elinoff & West Penn Emp. Profit Sharing Plan, defendants-appellants.
Lunn, Irion, Johnson, Salley & Carlisle by Jack E. Carlisle, Jr., Shreveport, for Peacock's Jewelers, plaintiff-appellee.
Blanchard, Walker, O'Quin & Roberts by Roy S. Payne, Shreveport, for St. Paul Fire & Marine Ins. Co., plaintiff-appellee.
Before HALL, MARVIN and FRED W. JONES, Jr., JJ.
MARVIN, Judge.
After a five-week jury trial resulting in a judgment awarding more than $3 million in damages that arose out of a pre-Christmas burglary of Peacock's jewelry store in Shreve City shopping center in 1982, these appeals were taken by three defendants who were cast in solido. Appellants are these parties and their liability insurers:
Shreveport Alarm Company, the installer and monitor of Peacock's burglar alarm system,
Underwriters Laboratories, who authorized Shreveport Alarm to certify the quality or UL classification of Peacock's alarm system, and
The owners of the shopping center, who are Peacock's lessors whose utility equipment room away from Peacock's leased premises contained the telephone wire dedicated to the Peacock's alarm system.
Over $700,000 in merchandise was stolen in the burglary, some of which was insured against a burglary by Peacock's co-plaintiff and subrogee, St. Paul Fire & Marine Ins. Co. St. Paul paid its policy proceeds ($462,651) to Peacock's and its officers in two payments. St. Paul was awarded that amount in the judgment. Peacock's was awarded $2,628,136 in damages.
The specifications of error concern the measure and amount of damages, factual and legal causation, and require our consideration of the respective relationships, legal and contractual, between plaintiffs and each defendant.
The specifications additionally question the trial court's instructions to the jury, the jury's allocation of fault to each litigant and the professional burglars, and when legal interest begins to run against each defendant.
In answer to defendants' appeals, plaintiffs contend that legal interest on the award runs against all defendants who are cast in solido from the earliest date of judicial demand rather than from any later date that demand may have been made on a solidary defendant who was joined after the action was instituted. Burton v. Foret, 498 So.2d 706, 712 (La.1986), mandates our agreement with Peacock's contention.
We amend to reduce Peacock's award from $2,628,136 to $691,558.62, and to allow legal interest against the solidary defendants from the earliest date of judicial demand.
As amended, we affirm.

*391 FACTS
Our review leads us to agree with the statement in brief by counsel for one defendant that "[a]lthough the record ... is voluminous, most of the basic facts are ... undisputed."
On the Wednesday night (December 8) before the burglary (December 12), one of Shreveport Alarm Company's security guards, stationed at the telephone company office across the street from the back of Peacock's jewelry store, observed and reported to other employees of Shreveport Alarm what she called suspicious activity behind the shopping center. She reported that she saw a motor home drive up and park near the rear of Peacock's, from which three men dressed in worker's clothes departed. One or two other men remained in the motor home. The three men who departed the motor home entered the utility room of the shopping center that served Peacock's and its neighboring stores.
This plat, not to scale, depicts the relationship of Peacock's to the shopping center utility room and other places which are mentioned in this opinion:

*392 When the alarm company guard ended her workday and drove away from the telephone company building about 20 minutes after she first saw the motor home, she closely observed and followed the motor home which was then being driven on the street in front of her. She noted only two persons in the motor home and the absence of the three men whom she had seen enter the utility room. She recorded the license number of the motor home and later made a written report of what she had observed to the alarm company. The out-of-state license number, when later checked by police, could be traced only to a fictitious person.
About three hours after the guard last observed the van, the alarm company received a "signal" from the alarm at the Peacock's store. Investigation of the store building did not indicate any attempted entry. The utility equipment room of the shopping center was not investigated. After the Sunday burglary, police and experts surmised that the alarm was intentionally triggered on that Wednesday night by the burglars to allow them to determine how long it took investigators to respond to the signal.
The burglary investigation and a review of that Wednesday's videotape of visitors in the Peacock's store also revealed that earlier that day two persons, who were recognized by police as professional burglars, entered the store as customers and attempted to "case" the store.
On Friday, December 10, a third "suspicious" visitor to the store was noted when that visitor, under the guise of getting a piece of jewelry cleaned, was stopped by a Peacock's executive when he attempted to enter into the private area of the store where the safe was located. The videotape of Friday, December 10, was stolen in the burglary on December 12.
The investigation further disclosed that the lock on the front door of Peacock's had been skillfully drilled. The safe had been professionally opened with a cutting torch. Police and other experts estimated that it may have taken as little as seven seconds and not more than a minute to have professionally drilled the front door lock and that it would have taken about 15-30 minutes to "torch" and open Peacock's safe.
The burglars were selective in the merchandise they took. Jewelry of precious metal, jewels, and a few heavier and the more valuable pieces of sterling silver were taken. Zircons, or imitation diamonds discernable only by a professional, and other less valuable items of sterling and silver plate were left in the store.
Police and other experts deduced that the burglar alarm system had been professionally compromised or negated on Sunday sometime after 8 a.m. by the burglars attaching a "black box" electronic device to the telephone line dedicated to the silent alarm system which, with other lines serving Peacock's and its neighboring retailers in the shopping center, were centrally gathered in the shopping center's utility equipment room shown on the plat reproduced above.
The Peacock's alarm signaled an intrusion at 12:13 p.m. on that Sunday, December 12. The burglary investigation began about 10 minutes later. The burglars had departed the area by that time and no witnesses to the burglary were found. The temperature on that day was well below freezing. Investigators deduced that the Peacock's alarm sounded only after the burglary was completed and when the burglars removed their black box or electronic device from the telephone line serving the alarm system in the utility room.
Apparently for many months, the shopping center owners had not attempted to provide a lock on the door of the utility room. The shopping center manager effectively said he abandoned all efforts to do so after the locks and replacement locks were "continuously broken." The door of the utility room was allowed to remain unlocked, open or ajar, and the remains of the locking mechanism eventually became covered with cobwebs, vividly depicted in photographs made on that Sunday. Police officers who frequently patrolled the shopping center area stated that the door would not close or shut and that the lock had been broken for a long time.

*393 THE ALARM SYSTEM
Peacock's desired an Underwriters Laboratories, Inc., certified AA alarm system at its Shreve City store, one of three Peacock's stores in Shreveport. The UL certificate allowed Peacock's to purchase insurance coverage at a lower premium. In December 1982 Peacock's three stores in Shreveport had alarm systems that were certified as UL approved Class AA by Shreveport Alarm Company. Shreveport Alarm certified, installed, serviced, and monitored the system at the Shreve City store since late 1976 before Peacock's opened the Shreve City store for business.
Shreveport Alarm Company, an approved "Installing Company" of UL, was authorized by UL to certify on a UL certificate the "class" of the alarm system it installed for a customer [Class AA affording the highest protection and Class C the lowest], "in compliance with requirements established by [UL]."
The UL certificate on the customer's system states that if UL determines from "field inspections of representative installations" that the system is incorrectly certified or does not conform to UL requirements, the system shall be corrected or the certificate cancelled.
UL made annual inspection visits to Shreveport Alarm Company in 1979, 1980, 1981, and 1982. On some of those visits, the UL inspector made a field inspection of one or more of the three Peacock's stores in Shreveport.
The silent alarm systems that were installed by Shreveport Alarm at the three Peacock's stores, later described herein in more detail, were Class AA UL approved systems when installed. They did not conform to UL requirements for a Class AA system after September 14, 1980.
The system at Shreve City store, however, on December 12, 1982, and then only eligible for a Class A UL certificate, was easily compromised by professional burglars equipped with the black box electronic device. The three Peacock's stores were the only systems certified as UL approved Class AA systems that were serviced and monitored after September 14, 1980, by Shreveport Alarm Company, according to Shreveport Alarm's records.

PROCEDURAL POSTURE
Appellant Shreveport Alarm Company does not question its liability to Peacock's, but contends that the damage award is excessive and an abuse of the jury's discretion. The appeals by the shopping center owners and by UL challenge liability as well as quantum.
Two suppliers of security equipment to Shreveport Alarm Company (ADEMCO and Potter Electric Signal Company) and the South Central Bell Telephone Company, whose telephone line was employed in the Peacock alarm system, were joined as co-defendants. See Peacock's, Inc. v. South Cent. Bell, 455 So.2d 694 (La.App. 2d Cir. 1984). ADEMCO's motion for directed verdict after Peacock's rested its case, was granted by the trial court. The jury found South Central Bell and Potter Company free of fault or negligence. Issues which may have related to these three defendants are not before us.
The third-party demand of UL against Shreveport Alarm Company was dismissed in accord with a joint stipulation of those litigants and [fortunately, as we shall later explain] is not before us.
The affirmative defenses made by the shopping center owners against Peacock's [founded upon waiver, indemnity, and hold-harmless language in the lease] and third party demands against Peacock's were rejected in the judgment and are before us, as against Peacock's, in the appeal by the shopping center owners.
All other incidental demands that were rejected below are not before us.
At the request of one or more litigants, the jury was instructed about and was asked to answer 36 special verdict interrogatories, including the allocation of fault or negligence as to each defendant and as to the professional burglars who were not parties. The answers by the jury produced this allocation of fault:

*394
Shreveport Alarm Company 65%
Underwriters Laboratories, Inc. 20%
Shopping Center Owners 10%
Burglars 5%

We are asked to legally justify the jury's allocation.

JURY CHARGE AND VERDICT
The charge to the jury consists of 22 doubled spaced typed pages. It is the charge traditionally given in a tort action. We shall omit some general parts of the charge which are not complained of and edit and reproduce, as an unpublished appendix to our original opinion, other parts we deem pertinent.
To the 36 special verdict interrogatories, the jury concluded:
that Shreveport Alarm, UL, the shopping center owners, and the burglars were negligent or "at fault" in the percentages shown above;
that Peacock's was not comparatively negligent or "at fault";
that the insurer of Peacock's had a right of subrogation against the owners of the shopping center;
that the open utility room door was a defect in the shopping center property which was not a part of the premises leased by Peacock's over which Peacock's had no supervision or control, which defect resulted in damage to plaintiff;
that Peacock's did not agree to indemnify the landlord from the type of claims Peacock's and its insurer are making in the case;
that Peacock's agreed in the written lease of the store to waive any claims against its landlord for damages to or theft of property on the leased premises (our emphasis for purpose of discussion which follows).
The argument to the jury and the court's charge squarely presented the jury with the question of the liability of the shopping center owners arising out of the fact of the unlocked utility room door.
The court charged the jury that a lease provision relieving a lessor from damages for defects in the leased premises does not relieve the lessor from damages resulting from a defect not part of the leased premises.
When we further consider that the jury found in answer to a specific interrogatory that the open door was a defect not part of the leased premises that caused damage to Peacock's, the emphasized finding OF THE JURY that Peacock's agreed in the lease to the waiver is placed in an understandable and acceptable context. In that context, it is clear that the jury found the shopping center owners liable for damages under tort law for allowing the open utility room door to create, away from the leased premises, an unreasonable risk of harm from a successful burglary. The shopping center owners were not found liable for any unreasonable risk of harm on the leased premises or for any breach of a lease obligation. We shall hereafter only briefly discuss the lease provisions and shall consider whether the jury was clearly wrong in its conclusion in this respect.

THE ASSIGNMENTS OF ERROR
Eight of the 24 assignments of error asserted by the owners of the shopping center are leveled at the jury's answers to the special verdict interrogatories. The 16 remaining assignments assert errors in rulings by the trial court.
Two of the three assignments asserted by UL on the issue of liability allege error in the trial court's rulings and the third contends that the jury erred in finding plaintiffs carried their burden of proof.
Additional assignments of error are asserted by the shopping center owners, UL and Shreveport Alarm Company on the issue of damages.

NEGLIGENCE QUESTIONS
The law has long observed that there may be more than one cause-in-fact of damages. When that factual circumstance is joined with the issue of the scope or extent of the duty of a particular defendant, the problem for the courts has been described as exasperating and elusive. Malone, Ruminations on Dixie Drive It Yourself Versus *395 American Beverage Company, 30 La. L.R. 363 (1970).
The key for resolution of the problem begins with two entirely different inquiries, one into cause-in-fact, and the other into law and legal policy. The legal inquiry determines whether the duty of a particular defendant that plaintiff urges has been breached extends to protect against the risk of the harm that the plaintiff suffered and whether there are legal or policy reasons which excuse the defendant from the consequences of his negligence. Pierre v. Allstate Insurance Company, 242 So.2d 821, 831 (La.1970), discussed in Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L.R. 1 (1973).
Cause-in-fact is a "but for" inquiry into logical, or reasonable, and not absurd, extremes. Malone, Ruminations, supra.

CAUSE-IN-FACT
Shreveport Alarm installed a system at Peacock's in 1976 that included electronic intrusion and motion detectors or sensors connected by a dedicated telephone line to Shreveport Alarm's central station. When either sensor detects an interruption or intrusion and causes a change in either the tone or the current being transmitted to the central station, an alarm at the central station is activated and signals to alert employees to respond. The system is not designed to sound an alarm at Peacock's store.
Earlier direct line systems transmitted only current. Tone was added to such systems in 1967 to make it more difficult to compromise the system. After that time burglars had to duplicate current and tone to compromise the system. UL then allocated its "highest certification category," Class AA, to the tone line systems.
Within a decade, however, professional burglars began successfully compromising the tone line systems. Manufacturers of direct line equipment then devised equipment to generate a programmed and pseudo-random tone that varied at short and inconsistent intervals and did not repeat its sequence of random tones except after very long periods of time. The random tone line system is extremely difficult to compromise. The steady or single tone line system was easily compromised after 1975.
According to UL records, between 1977 and September 14, 1980, UL advised Shreveport Alarm and other installing companies on nine occasions that the improved random line would replace the single tone line as the highest category, UL approved Class AA. In 1978, UL directed the installing companies either to upgrade the single tone systems to random tone systems or downgrade the single tone systems to UL approved Class A certification. Extensions of time were granted by UL, but eventually UL required the alarm companies to accomplish one of the alternative changes on or before September 14, 1980.
We recognize that no alarm system is 100 percent effective indefinitely. Since September 14, 1980, the standards that UL has set for the random line Class AA certification contemplate, according to UL witnesses, that the approved random-line system (equipment and personnel) will be able to withstand 95 percent of the attempts made to compromise it.
On some annual inspection visits to Shreveport in 1979, 1980, 1981, and 1982, UL inspected one or more of the three Peacock's stores in Shreveport, the only three Class AA systems that Shreveport Alarm served and monitored, according to Shreveport Alarm's business records.
According to experts, and independently of any visit to a Peacock's store, a UL inspector could have easily and quickly determined at the Shreveport Alarm Company's central station that Peacock's alarm systems did not conform to UL Class AA standards on and after September 14, 1980.
The manager of Peacock's Shreve City store testified that the UL inspector visited his store in July 1982. The duplicate certificate for that store in UL's Tampa office bears the initial of that inspector between the stamped date "JULY 1982" on the certificate. UL acknowledges that its inspector visited the other Peacock's stores in Shreveport during July 1982, but explains *396 that the stamp and initial on the certificate for the Shreve City store were placed there by mistake.
Peacock's vice-president testified that he called the UL inspector, Fasani, at his office in Tampa on August 5, 1982, because
we had had an alarm go off early that morning. Again at 9:00I think it was at 9:00 that morningShreveport Alarm came out and was having trouble or was in the process of repairing the system [at the Shreve City store].
When I went downtown later that day at noon, my father reminded me that Shreveport Alarm had not come in and made the requirements or the corrections on our downtown store [that Fasani had required in July 1982], ... when Mr. Fasani was there, he mentioned that there was a thirty-day period in which they could do so, so that prompted my father to tell me to call Underwriters Lab to see, number one, why Shreveport Alarm had not put in the ultrasonics on the second floor, plus, since [neither] I nor he were present at Shreve City or the South Park store, to verify that both those stores did meet the UL approval.
Q. What was his reply?
A. That they did, and that Shreveport Alarm had four days [left] on that thirty-day period to install the ultrasonics downtown.
Q. He mentioned nothing whatsoever about downgrading the rating?
A. No, sir.
Peacock's vice-president testified that Fasani told him that all Peacock's stores met with UL approval at that time when the UL certificates in the Peacock's stores were UL approved Class AA.
Fasani's superior, Saunders, testified that UL's inspectors are required to report their findings only to the alarm company and not to the alarm company's customers. He also said the inspectors are allowed to respond to customers' inquiries and "if anybody calls, we feel responsible for giving them reasonable answers." Fasani died shortly after the action was instituted.
The burglars attempted to "case" the store and successfully "cased" the utility room before the burglary. To minimize their risk, the burglars first had to determine what security system Peacock's was using. This determination could be made only from the dedicated telephone line that served the system. That line originated in the locked shopping center store and first became accessible to the burglars when it entered the utility room. The current and the tone being transmitted over that line had to be monitored by the burglars' electronic device and duplicated to avoid an alarm signal to the central station.
Once the burglars deduced on Wednesday that the utility room door was always open, they did not have to worry about what additional security measures might have been added or taken by Sunday, as most probably, in the mind of the jury, would have been the case if the burglars had had to break the lock on Wednesday night.
After the burglars learned that Peacock's was using the Class A single or steady, and not the Class AA random, tone line security system, they were confident that their black box device would probably successfully compromise the system. They may have tested their black box on the system on Wednesday night. We shall not speculate how long the three men remained in the utility room on the Wednesday night after they were observed entering it by the Shreveport Alarm Company security guard at the telephone building twenty minutes before she ended her workday.
Admittedly, the burglars might have found and monitored the system's dedicated line after it exited the shopping center utility room, but the open door of the utility room offered them ready access, more seclusion, time, and less risk to monitor there than in an underground conduit or overhead on a utility pole.
UL did not require Shreveport Alarm to conform to its standards by either upgrading the Peacock's system or downgrading the certificates to Class A when UL could have learned and should have known that the systems did not conform during its *397 annual inspection visits to Shreveport in 1981 and 1982.
We acknowledge that professional burglars might successfully compromise any alarm system at any time, but also note that UL considers that a UL-approved random tone Class AA system is able to withstand 95 percent of the attempts to compromise it.
If the system had been upgraded to Class AA, the burglars' odds for compromising the system would have been substantially reduced, according to UL's own assessment. If the certificates had been timely downgraded to Class A, Peacock's would have taken other measures to provide better security.
We cannot find that the jury was clearly wrong in concluding that the conduct of both UL and the shopping center owners contributed to or increased the risk of harm to Peacock's from a successful burglary, or in concluding that but for such conduct, the burglars most probably would not have fully succeeded in their crime. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Cause in fact is a "but for" factual determination for the jury.

DUTY

UNDERWRITERS' LABORATORIES, INC.
Cause-in-fact inquiry does not end, but begins, the analysis of duty issues. Conduct that causes or contributes to the injury to another does not impose liability under CC Arts. 2315 and 2316 unless the defendant breaches some legal duty he owes to the particular plaintiff. A defendant's duty may arise out of a legal or conventional relationship to the plaintiff. The determination of whether a duty exists as a result of the relationship between the parties must be made on a case-by-case basis. Dornak v. Lafayette General Hospital, 399 So.2d 168 (La.1981), citing Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). We discuss the relationships.
UL was founded by insurance companies in 1893 to establish, and then test for compliance with, safety standards for various products. UL began testing security-related products in 1922 and a few years later began its certification and follow-up inspection program for burglar and fire alarm systems. The managing engineer of UL's Burglary Protection and Signaling Department testified:
The alarm system involvement first began with the testing of components of alarm systems to assure three things: That they were safe, because they are all electrical in nature; that they are reliable; and that they are effective, and because of the leverage that the insurance industry has on its consumers, there was designed a system for encouraging the acquisition and use of private security equipment, and it was in the form of discounts on insurance premiums.
It also became apparent to the insurers and to UL in the very early days that a good piece of equipment was not necessarily reliable unless it was properly installed and maintained.
And that is the heart and soul of UL's certificate service, that not only must you have good equipment, but it must be properly installed and properly maintained. * * *

[Class AA is] the highest certification category that we have. It's obviously intended to serve the highest risk installations. And it is expected on the part of the insurance industry that relies upon it that it will have a very high probability of reducing the risk of loss. (Our emphasis.)
Only about 13 percent of central station alarm systems in the United States are UL approved. UL authorizes certificates with designations of Classes AA, A, BB, B, CC, and C. UL and the insurance industry expect that Class AA, the highest designation, will have a high probability of reducing the risk of loss from a burglary.
Shreveport Alarm Company became a UL-approved central station, or installing company, by contract in 1976. In the Listing and Follow-Up Service Agreement between Shreveport Alarm and UL, Shreveport Alarm agreed to determine that UL *398 approved systems complied with UL's requirements and to these provisions:
that [UL], in performing its functions in accordance with its objects and purposes, does not assume or undertake to discharge any responsibility of [Shreveport Alarm Company] to any other party or parties, and
that the Follow-Up Service of [UL], and any sampling, inspections or tests conducted by [UL] in connection therewith, is designed to serve only as check on the means which [Shreveport Alarm Company] exercises to determine compliance of the [alarm systems] with the requirements of [UL], and that [Shreveport Alarm Company] is in no way relieved of [its] responsibility for the [systems].
UL furnished approved central station alarm companies with blank UL certificates to be issued to customers who requested them. The alarm company simply fills in the UL rating for the customer's system and other pertinent identifying information.
UL's contract with Shreveport Alarm obligates UL to make annual inspections of "the means [equipment and personnel] which [Shreveport Alarm] exercises [in its operations] to determine [Shreveport Alarm's] compliance ... with the requirements of [UL] ..."
The UL certificate covering the premise alarm at Peacock's Shreve City store for the period October 14, 1978, through October 13, 1983, was identified as "CENTRAL STATION GRADE AA ALARM CERTIFICATE" and read:
This certifies that the Installing Company [Shreveport Alarm Company] is listed by [UL] as furnishing the above mentioned system and is authorized to issue this certificate to the equipment described hereon as its representation that such equipment and all connected wiring and devices is in compliance with requirements established by [UL] for the class.
The certificate also contains this language, which UL asserts should absolve UL of all liability to Peacock's:
[UL] conducts countercheck field inspections of representative installations of the installing company [Shreveport Alarm Company], but assumes no liability for any loss which may result from failure of equipment, incorrect certification, nonconformity with requirements... If an installation is found not in conformity with requirements, it shall be corrected or the certificate is subject to cancellation.
The UL certificate effectively tells the alarm company customer that UL conducts inspections to determine that Shreveport Alarm conforms to UL requirements and is required to correct any nonconforming equipment or practices under threat of cancellation of the UL certificate.
It is perhaps superfluous to reiterate testimony of UL's own expert to the effect that the UL-approved Class AA alarm system serves those customers that have the "highest risk" of a burglary, such as jewelry stores, and that it is "expected" that the UL approval of a Class AA system will be relied on and will have a "high probability of reducing the risk of loss" from a burglary or attempted burglary. That "high probability," UL explains, is that the UL-approved Class AA system is expected to withstand 95 percent of the attempts to compromise it.
UL charges alarm companies for each listing application, for each certificate issued, and for the cost of UL's follow-up inspections. The alarm companies obviously include and incorporate these expenses into their cost of operation and charges to their customers.
UL conducted annual inspections of Shreveport Alarm's central station in 1979, 1980, 1981, and 1982, as it was obligated to do, according to the managing engineer of UL's Burglary Protection Department. He acknowledged that by simply viewing the receiving equipment at the central station a UL inspector could determine whether the equipment was correct for the Class AA random tone line system. He explained that UL inspectors did not use a "plug" test device which another expert testified would allow, in a matter of seconds, the determination that a random line system *399 was properly functioning at the central station and without having to visit a customer location. UL's engineer acknowledged that the purpose of the inspection program, annual and random, was to verify the continued compliance with UL's standards.
UL further acknowledged that an inspection of the alarm company's equipment list for a customer's system would enable UL to easily determine whether the customer's system was Class AA random tone or Class A single tone.
If UL finds deficiencies in an alarm system, the alarm company is notified and given a period of time to make a correction. If the alarm company does not timely notify UL that the corrections have been made, UL sends a form letter to the alarm company's customer stating that the UL certificate will be cancelled by UL because of the alarm company's default. The UL form letter does not describe to the customer the deficiencies that UL found in the system or the corrective action that UL requires.
UL contends the language in its agreement with Shreveport Alarm Company (which seeks to disclaim responsibility for Shreveport Alarm Company's obligations to its customers) and the language on the UL certificates (which seeks to disclaim responsibility if an installation is found not in conformity with UL requirements) preclude a finding that UL owed any duty to Peacock's. We disagree.
Because neither disclaimer is in a contract to which Peacock's was a party, we readily distinguish this case from the many cases cited by UL upholding limitations of liability that were agreed upon by contracting parties.
Moreover, the disclaimer language on the certificate must be read in conjunction with the language which immediately follows it:
If an installation is found not in conformity with requirements, it shall be corrected or the certificate is subject to cancellation.
This language expressly recognizes and reiterates UL's duty either to cause the nonconforming system to be corrected or to cancel the UL certificate. UL's inspections failed to fulfill that duty.
UL argues that Shreveport Alarm, and not UL, is obligated to correct the customer's system or cancel the certificate. According to UL's own description of its "follow-up inspection program," however, it is UL that undertakes inspections to verify and require that the alarm company conform to UL standards.
UL's employee, Saunders, testified that the follow-up inspection program is what makes the UL certificate meaningful (we should add, to insurance companies and to alarm company customers who are expected to rely on the UL certification). UL's Saunders agreed that
The mechanism that makes the certificate meaningful is the periodic U.L. inspection program whereby alarm systems maintained by each listed alarm company and covered by a certificate are regularly inspected by U.L. on a random basis to verify continued compliance with U.L. requirements.
The language in the certificate, taken as a whole and in the light of the circumstances of this record, emphasizes UL's obligation to monitor the installing companies, who benefit by the UL certificate, and to require the installing companies to conform to UL standards. The language suggests that the alarm company customer might rely on UL to conduct a reasonable number of random inspections, as well as the required annual inspections, to assure that the alarm company conforms to UL standards.
Certainly if UL had conducted a reasonable inspection of the two Peacock's stores it admits it visited in 1982, or of Shreveport Alarm either in 1981 or 1982, the UL approved Class AA systems at the three Peacock's stores would not have continued as Class AA systems until December 12, 1982.
The language in the certificate does not disclaim UL's obligation to require Shreveport Alarm to conform to UL standards and does not support UL's contention that as a matter of law it owed no duty to Peacock's.
*400 UL's duty to Peacock's derives from CC Art. 2315 and its undertaking to randomly field inspect Peacock's and to annually monitor the operations of Shreveport Alarm Company to require compliance with UL standards. UL's contractual duty to Shreveport Alarm was to annually inspect that company and to randomly inspect some of the systems that Shreveport Alarm installed and served.
Privity of contract is not necessary to find the existence of a general legal duty of reasonable care. Similarly, UL's duty of reasonable care cannot be found to extend only to the insurance companies for whom it functions, as UL strenuously argues.
All litigants and this court accept UL's premise that UL did not obligate itself to anyone to guarantee that a burglary of a Shreveport Peacock's store could not occur. It must be equally accepted that burglary is the precise risk that the UL approved alarm system is intended to protect against. The successful compromise by the black box device of the tone line system in the 1970's was the precise risk that the UL approved Class AA random line standards were devised to protect against.
To fulfill UL's corporate purpose, its participating insurance companies rely on the UL certificate and offer reduced premium rates to businesses that have the certificate. Premiums are reduced because the insurance companies expect, and perhaps statistically prove, that the UL approved Class AA certificate on an alarm system will substantially reduce the risk of loss from a burglary.
It is altogether logical and reasonable that the store owner, who either desires, or is a potential customer for, theft insurance, should expect the exact same thing that his insurance company expects.
It does not strain credulity to recognize that UL had a duty to Peacock's to perform in a reasonable manner, the annual (Shreveport Alarm), and random (Peacock's), inspections it actually undertook to perform and report its findings either or both to Shreveport Alarm and to Peacock's. See and compare Dornak v. Lafayette General Hospital, supra; Mills v. Ganucheau, 416 So.2d 361 (La.App. 4th Cir. 1982); and Schouest v. Stipelcovich, 490 So.2d 294 (La.App. 5th Cir.1986), writ denied.
The fact that the burglars acted intentionally and in disregard of law does not negate UL's general duty to perform its undertaking in a reasonable manner. The negligent performance of conduct intended to protect another against the risk of criminal misconduct, even gratuitously undertaken, may create liability. See Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984).
State v. Joint Com'n on Accreditation of Hosps., 470 So.2d 169 (La.App. 2d Cir. 1985), writ denied, is not to the contrary, but illustrates that the determination of the extent of the duty of a particular defendant must be decided upon careful analysis on a case by case basis and not upon the "rule" of a particular case. In short, the JCAH fulfilled its duty to conduct a reasonable inspection and the UL inspector did not fulfill UL's duty.
While foreseeability is not the rule for determining how far a duty extends, it is a factor to be considered in associating the duty that is urged with the risk of the harm suffered. Robertson, Dialogues on Hill v. Lundin, supra. If UL did not conduct the inspections it undertook in a reasonable manner, then it is imminently foreseeable or expected that both the insured store and the store's insurer would suffer injury from the burglary. Compare Alley v. Courtney, 448 So.2d 858 (La.App. 2d Cir.1984); Mobley v. Rego Co., 412 So.2d 1143 (La.App. 2d Cir.1982), writ denied.
UL was being paid, directly by Shreveport Alarm and indirectly by Shreveport Alarm's customers, to perform its obligations to Shreveport Alarm. The expense of performing those obligations is not increased by recognizing that UL's duty to perform reasonably extends to afford to Peacock's its 95 percent protection against the risk of a successful burglary.
No social, economic, or practical policy reasons are suggested to us which might tend to excuse UL from its duty to reasonably *401 perform its inspections in these particular circumstances. The jury did not err in recognizing the duty.

UL'S BREACH OF DUTY
After September 14, 1980, and during its 1981 and 1982 inspections, UL could easily have learned and should have known that Shreveport Alarm's UL Class AA approved system for Peacock's did not conform to UL standards because of the circumstances which we have detailed. UL's contention that the Class AA random tone equipment was probably installed before, and taken out after, the July 1982 inspection, was obviously found not credible by the jury.
UL is liable in tort, not because the UL approved Class AA system of an alarm company in a customer's store was successfully compromised by professional burglars, but because UL, having undertaken two annual inspections and some random inspections, negligently failed in those undertakings to discover and report that the system that was compromised did not meet UL's standards for a Class AA system in time for the system to have been upgraded or in time for the customer to have taken other measures to afford more protection against the risk of a burglary. UL additionally represented that all Peacock's Shreveport stores met the UL approved Class AA requirements.

JUSTIFIABLE RELIANCE
When UL's Fasani made his random inspection of Peacock's downtown Shreveport store in July 1982 he was accompanied by Norton, of Shreveport Alarm, and by Peacock's vice-president. Fasani mentioned that he found deficiencies in the placement of ultrasonic motion detectors at that store. He reported these deficiencies in writing.
After the Shreve City store signaled an alarm in August 1982, Peacock's vice-president made the telephone inquiries to Fasani about the correction of those deficiencies in the downtown store and about quality of the alarm systems in all three Peacock's stores. The fact, but not the content, of that telephone call, is admitted by UL. The content is quoted on p. 13 of this opinion. Peacock's vice-president testified that in security matters his acceptance of Fasani's recommendations [whatever needed to be done] was "absolute."
UL's Saunders acknowledged the worth or meaningfulness of the UL certificates, not only to insurance companies, but to persons in retail businesses, who rely on the certificates as indicative of a reliable alarm system. Peacock's vice-president considered that Peacock's stores would be "completely" protected by the highest UL approved classification because Peacock's needed that classification to purchase the desired insurance coverage.
UL argues that the disclaimer language in its certificates, quoted on p. 18 of this opinion, legally precludes a jury finding that Peacock's was justified in relying upon the representations of UL employees and in the certificates about UL's "approval" of the Shreveport Alarm Company's alarm systems in the three Peacock's stores. We cannot agree, especially when the language that directly follows the disclaimer is considered.
The weight, as well as the believability, of testimony is the prerogative of the trier of fact. In the light of this record, we do not find clearly wrong the jury's conclusion that it was reasonable for Peacock's to rely on the representations of the UL certificates and the UL employee, Fasani, that the alarm systems at the Peacock's stores were Class AA systems that met with UL approval within a few days or weeks after the UL employee made the random inspection in July 1982.

THE SHOPPING CENTER OWNERS; DUTY-BREACH
The court correctly charged the jury that lease provisions relieving a lessor from damages to the lessee or others that are caused by defects in the leased premises does not relieve the lessor from damages caused by defects on the lessor's property that is not a part of the leased premises. See Standard Office Supply Co. v. Stonewall Invest. Co., 267 So.2d 768 (La.App. 2d Cir.1972); Parrino v. Royal Ins. Co. of America, 484 So.2d 282 (La. App. 3d Cir.1986), and cases discussed and *402 cited therein and under LSA-RS 9:3221, LSA-C.C. Art. 2695, 2703. Peacock's cause of action is not based on a breach of the lessor's warranty of peaceable possession but on CC Art. 2315. CC Art. 2703 is not applicable in this latter circumstance.
Such things as stairways used in common by all tenants of a leased building have been held not to be a part of the leased premises so as to be subject to lease provisions which exculpate the lessor from damages from defects on the leased premises. The utility equipment room door should not be considered any differently.
In Standard Office Supply Co., supra, we noted that "LSA-RS 9:3221 [which allows a lessor to contractually relieve himself of liability for defects on the leased premises] does not apply to damages incurred by [the] lessee or third persons resulting from a defect in the property which is not part of the leased premises, and over which lessee has no supervision or control." 267 So.2d at 770. The general La.C.C. 2315 duty to avoid creating [here away from the leased premises] an unreasonable risk of harm to another, we extend to protect even the lessee, notwithstanding lessor's argument about language to the contrary in the lease.
According to Professor Yiannopoulos, who writes in a supplement to the brief of the shopping center on the origin of our C.C. Art. 2315 and its interpretation,
... a lessor, like any third person, may be held to delictual liability on account of a fault ... that bears a direct casual connection with the loss of the lessee. This means that the lessor may be liable to the lessee in tort, not in his capacity as lessor but as any other person, as if the lease did not exist. To find the liability of the lessor ... the court should be prepared to find a duty, a breach ... and a causal connection between the two.
It is imminently foreseeable that a jewelry store has the highest exposure to a burglary. The risk of burglary exists to all stores in the shopping center.
We agree that the duty of a shopping center owner should not extend to protect all tenants against all risks. The duty urged may not be so easily associated with some risks that are not reasonably foreseeable and anticipated and yet may be easily associated with other risks that are unanticipated and only remotely foreseeable. Policy reasons must be considered in determining what risks are within the realm of protection. Entrevia v. Hood, 427 So.2d 1146 (La.1983), and authorities cited therein. Moreover, enforcement of a duty may be so burdensome that defendant's neglect is excused by the law.
Long before the burglary, the shopping center manager had abandoned all attempts to keep the utility room door shut and locked. The shopping center owners controlled whether the door was shut and locked. Tenants and others had to seek access, when needed, from the manager during the time that the lock was being "continuously broken" and replaced.
As in UL's case, we can easily associate the duty of the shopping center to reasonably secure its utility room with the risk that a burglar may use the room to facilitate the success of his crime.
Under the circumstances of this record, we recognize, as the jury did, the duty of the shopping center owner to undertake reasonable efforts to shut and lock the door of the utility equipment room of the shopping center. The cost of reasonably maintaining a locked door is insignificant when compared to the injury that the open and unlocked door facilitated or contributed to. It is not suggested that enforcement of the duty is economically impracticable or burdensome.
We are not requiring a shopping center to purchase an alarm system, to hire security guards, or install bars or "burglar proof" the locks on doors and windows in the shopping center. No locked door is burglar proof. We are requiring that the shopping center not abandon reasonable efforts to maintain a shut and locked door on its utility equipment room under the circumstances.
The cost of maintaining a locked door is minute when compared to the risk of harm *403 it poses to tenants in the shopping center. We acknowledge that no locked door is burglar-proof, but, for the reasons expressed, we conclude that the unlocked door increased the risk of harm and facilitated the burglary to some degree.
No policy reasons are suggested that might negate this duty on the part of the shopping center.

INCIDENTAL DEMANDS, DIRECTED VERDICTS, SUMMARY JUDGMENTS, AFFIRMATIVE DEFENSES
Essentially these demands, motions, and defenses rest on the premise that, as to the shopping center, the language in the lease, and, as to UL, the language in the certificates and in its contract with Shreveport Alarm, establish that no duty was owed Peacock's.
We have found that each defendant owed and breached a duty to Peacock's. Further discussion of the several specifications of error based on the absence of a duty is not warranted. Any errors in the trial court's evidentiary rulings do not mandate a change in the result. The record supports the conclusion that Peacock's was not contributorily negligent.

SUBROGATION RIGHTS OF PEACOCK'S THEFT INSURER
The policy written for Peacock's by St. Paul Fire & Marine Insurance Company and payments by St. Paul to Peacock's on January 31 and May 2, 1983, effectively subrogated St. Paul to Peacock's rights against any person responsible for loss of Peacock's property up to the amount St. Paul paid Peacock's.
Contending that the jury finding to the contrary should be reversed, the shopping center owners assert that St. Paul's right of subrogation should be deemed "waived" and defeated because of this provision in Peacock's lease:
SECTION 9.03 Waiver of Subrogation
LESSOR and LESSEE each hereby waives all claims, causes of action and rights of recovery against the other, and their respective agents, officers and employees, for any damage to or destruction of persons, property or business, including but not limited to LESSOR's improvements, which shall occur on or about THE LEASED PREMISES and shall result from any of the perils insured under any and all policies of insurance maintained by LESSOR and LESSEE, regardless of cause, including the negligence and intentional wrongdoing of either party and their respective agents, officers and employees, but only to the extent of recovery, if any, under such policy or policies of insurance; provided however, that this waiver shall be null and void to the extent that any such insurance shall be invalidated or premiums increased by reason of this waiver. Our emphasis.
The insurance policy provides in part that no provision of the policy (such as the right to subrogation) shall be waived or changed... unless the change or waiver [of the subrogation right] is accomplished by a written endorsement of the policy. The policy was not endorsed.
The shopping center owners argue that the waiver in the lease should be enforced to negate the policy right of subrogation because the St. Paul policy was written after the lease and the policy was not invalidated and premiums were not increased. We do not agree.
The lease provision quoted above is ambiguous. It provides that lessor and lessee waive causes of action against each other for damages arising out of the other's negligence which shall result from any of the perils insured under an insurance policy, but only to the extent of recovery under the policy, and then provides the waiver shall be of no effect if the insurance shall be invalidated by the waiver or if increased premiums are charged because of the waiver.
If the insurance policy is deemed to be invalidated by the waiver in the lease, then the insurer has or had no obligation to pay its insured. If the insurer agreed to delete the subrogation right from the policy in return for higher premiums [the logical *404 way we deduce that the waiver would cause an increase in premiums], there would be no policy right to subrogation. Public policy prefers reimbursement or subrogation provisions in order to reduce insurance premiums. Liberty Mutual Insurance Company v. Weinberger, 329 So.2d 254 (La.App. 4th Cir.1976).
The issue as to subrogation would not arise if the policy were invalidated or if the policy itself negated subrogation. The waiver section apparently is an attempt by the lessor and lessee to waive causes of action against each other, but only to the extent that the waiver does not affect either party's privilege of obtaining insurance.
We need not further ponder the meaning of the waiver section. As we have held, exculpatory limitations or waivers in the lease do not apply to relieve the lessor from damages to the lessee when the damage is caused by the fault of the lessor away from the leased premises.
If the lessor cannot use exculpatory language in the lease to defeat recovery by the lessee of damages arising from the lessor's neglect away from the leased premises, the lessor should not be able to use the exculpatory language of the waiver of subrogation in the lease to defeat recovery by one who stands in the place of the lessee. A subrogee's right to recover derives from the right of the subrogor. Reliance Ins. Co. v. Tadlock, 420 So.2d 548 (La.App. 2d Cir.1982). The subrogation in this instance, need not be categorized exclusively as conventional. It has been held that an insurer who pays its insured for a loss that is caused by the neglect of another has a right and a cause of action against the other under legal subrogation without the execution of a conventional subrogation. Lumber Mutual Fire Insurance Company v. Kemp, 102 So.2d 248 (La.App. 1st Cir.1958). See CC Arts. 1825-1829.
A tortfeasor's monetary obligation to a plaintiff is not diminished or offset by a payment made to plaintiff gratuitously or under a plaintiff's insurance contract which does not provide for subrogation. Moreover, it has been held that a landlord and its liability insurer who were cast in judgment to a tenant for damages arising out of property stolen from the tenant by a burglar, cannot claim a credit or offset for the amount paid the tenant by the tenant's insurance company, whether or not the tenant's insurer intervened or brought a separate action. Norris v. State Farm Fire & Cas. Co., 416 So.2d 321 (La. App. 5th Cir.1982). The insured who subrogates a portion of his claim to his own insurer is not precluded, because of the subrogation, from suing in his own name for the entire loss. The tenant's insurer is then relegated to recovery against the tenant. See Pennsylvania Fire Ins. Co. v. Harrison, 94 So.2d 92 (La.App. 1st Cir. 1957). Carl Heck Engineers, Inc. v. Daigle, 219 So.2d 294 (La.App. 1st Cir.1969), writ refused; Mahaffey v. Benoit, 118 So.2d 162 (La.App. 1st Cir.1960). Even should we agree with the contention that the subrogation or policy is negated or invalidated by the lease provision, the shopping center's obligation to pay damages is not lessened.

JURY INSTRUCTIONS; ALLOCATION OF FAULT
Jury instructions that fairly and reasonably point up the issues and correct principles of law have been upheld. Oatis v. Catalytic, Inc., 433 So.2d 328 (La.App. 3d Cir.1983), writ denied. Mere discovery of an error in the instructions, of itself, does not justify the appellate court conducting a trial de novo without first measuring the gravity of degree of error and considering the instructions as a whole in the light of the circumstances of the case. Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La.App. 3d Cir.1985), writs denied.
If one factual finding by a jury, out of several, is found to have resulted from erroneous instructions, the appellate court should separately consider the jury's findings. Picou v. Ferrara, 483 So.2d 915 (La.1986).
The instructions, edited and reproduced in an unpublished appendix, as a whole *405 present no grave or reversible error. Even should we assume some deficiencies or obfuscations, our factual and legal review of the liability issues leads us to conclude that the judgment, as to liability, is correct, factually and legally, and should not be reversed.
The court charged the jury to separately consider the fault of all parties, including Peacock's, and allocate the percentage of fault, if any, of each party. Under the described circumstances, we do not find the jury clearly wrong in finding no contributing fault on Peacock's part. Peacock's efforts to secure what it controlled in the shopping center, that is, in its premises, to protect itself against the risk of a successful burglary, in all respects were reasonable.
The court's instructions to the jury included this charge:
If you find that plaintiffs have sustained a loss, you may consider what percentage of that loss is attributable to those who committed this burglary and theft, just as you would any other defendant in this case, remembering, however, there may be no recovery in this suit for the burglars' percentage of fault. [Appellants' emphasis.]
The law requires that the jury consider not only the fault of those who are parties to the action, but as well, the fault of other persons, whether a party or not. CCP Art. 1812. Fault in that sense apparently includes intentional and unintentional conduct that causes injury. CC Art. 2323, Stone, Tort Doctrine § 61, La. Civil Law Treatise, Vol. 12 (1977). See Thompson v. Cane Garden Apartments, 480 So.2d 373 (La.App. 3d Cir.1985).
The quoted charge was correct in directing the jury to weigh the fault of the burglars with the fault of others that it might find at fault. The last clause of the charge [remembering, there may be no recovery in this suit for the burglars' percentage of fault] could have been interpreted by the jury literally and not as a direction that the greater fault had to be placed on others if the plaintiffs were going to recover anything.
The jury could have understood the instruction to mean, that while any judgment or recovery against the burglars would have to come in another suit because the burglars were not parties to this suit, the jury should assign some percentage of fault to the burglars in this suit because the law, however incongruously in the jury's mind, requires it. See Varnado v. Continental Ins. Co., 446 So.2d 1343 (La. App. 1st Cir.1984), criticized by Robertson, Ruminations on Comparative Fault, 44 La.L.Rev. 1341, at 1346 (1984).
The apportionment to the burglars by this jury would not be res judicata even to the three appellants, because the burglars were not parties. LRS 13:4231, Mitchell v. Bertolla, 340 So.2d 287 (La.1976). At this juncture we need not speculate what amounts either Peacock's or the appellants in this appeal might recover from the burglars if they became known and were subjected to service in another action. From the burglars, Peacock's may be able to recover even its non-foreseeable losses. See discussion infra p. 40-41, of CC Art. 1997.
The purpose of assessing fault against all persons whose fault contributes to an injury to a non-negligent plaintiff, whether parties or not, is to allow the faulty persons to apportion and claim contribution between themselves and, as well, claim credit for what a non-party, found liable to plaintiff, may have paid plaintiff. CC Art. 1804, Garrett v. Safeco Ins. Co., 433 So.2d 209 (La.App. 2d Cir.1983). In this appeal, the appellants, who were cast in solido, raise no issues relating to indemnity or contribution between themselves. The only demand which might have presented the issue was removed from our consideration by the stipulation between Shreveport Alarm Company and UL in the trial court.
The apportionment of fault by the jury between the three appellants effectively found that Shreveport Alarm was about seven times more at fault than the shopping center and was more than three times more at fault than UL. The jury's relative apportionment to the appellants, in our *406 opinion, accomplishes justice, is in accord with our individual assessment, and is not clearly wrong under this record. Moreover, each defendant is solidarily liable for the whole of the damage to plaintiffs.
In this circumstance, and with obvious gratitude, we avoid further attempt to resolve how the jury should have considered the fault of the burglars and whether the allocation of only five percent fault to the burglars was clearly wrong.

MEASURE OF DAMAGES; QUANTUM
Peacock's economic expert explained to the jury that
[t]he amount that it would take to make [Peacock's] whole ... would be a recovery of lost profitsgross profits that isthat would have occurred since the time of the burglary until the present [time of trial and] the loss in gross profits from this ... time until [1990, the time, according to this expert's projection, that Peacock's] reaches the position they would have enjoyed otherwise, plus whatever inventory has not been replaced.
Peacock's expert calculated the amount to make Peacock's whole to be $3,727,947 in gross profits if Peacock's continued to experience, after 1982, its 1975-81 rate of growth, and to be $2,731,420 if Peacock's experienced only one-half of that rate of growth. The jury awarded $2,659,921, or approximately 95 percent of the economic expert's lesser projection that was based on one-half of Peacock's 1975-81 growth rate. We need not speculate how the jury may have reached its award.
When asked about other factors that could have influenced Peacock's decrease in sales in 1982 before and after the burglary, and in the years since 1982, Peacock's expert said:
"If you look at what the sales figures look like for the year up until December 12th of 1982, the figures were ... close to or in some cases greater than what sales have been the year before.... [On] December 12, 1982, the sales for the Shreve City store went right down the tube. You look at them for the rest of December they were terrible. January [1983] is no better. [February] is no better than that. If you look at the other two stores, they went down as well and never recovered. IT'S LIKE TAKING A LOOK AT THE FLIGHT OF AN AIRCRAFT AS IT'S GOING ALONG, AND YOU SAY, WELL THERE WAS SOME HAIL, THERE WAS SOME BAD FOG, THERE [WERE] A LOT OF OTHER THINGS.
* * * * * *
The analogy of the airplane would follow in this wise. A lot of things affect the flight of an airplane. But if it crashes, you look at the immediate cause. If you saw that it was struck by lightning and came out of the sky, you would have to say ... that's why it came out of the sky.... One of my favorite things is [that] everything should be made as simple as possible. Well, that's simple.... I'm saying on December 12th they had a burglary. They lost a big chunk of what it takes to run their business. And that's where the thing is approximately located." (Emphasis supplied)
Peacock's fiscal year begins March 1. About fifty percent of Peacock's sales are made in the last three months of the fiscal year, December, January, and February. Gross sales for the period beginning March 1, 1982, through November 30, 1982, in the three Peacock's stores were 8.5 percent less than for the same period beginning March 1, 1981. December 1-12 sales in 1982 were 19 percent less than the December 1-12 sales in 1981 in the three stores. December 13-31 sales in 1982 were 13 percent less than in 1981 in the three stores.
Gross sales in fiscal year 1982 (the year of the burglary) were $475,641 less than in fiscal year 1981. Gross sales from December 13 through February 28 in prior years averaged about $800,000. After the December 12, 1982, burglary, gross sales for the same period, December 13-February 28, totaled $488,000, a decline of more than $300,000.
Peacock's theory of its damages is that to place Peacock's in the same financial *407 position it would have been in if the burglary had not occurred, the law should entitle Peacock's to the replacement value of the merchandise that was stolen and the gross profits, actual and projected, lost between December 12, 1982, and 1990. Peacock's expert charted Peacock's sales and profits for the years 1975-1981 to make his projections, reasoning that the loss of about $700,000 in merchandise and 47 percent gross profit thereon effectively impacted Peacock's cash flow and its projected growth as a business.
Analyses and projections made by Peacock's expert in this action are similar in approach to those the same expert made in an action in which a downtown Shreveport building housing a printing business was expropriated. City of Shreveport v. Standard Printing Co., 427 So.2d 1304 (La. App. 2d Cir.1983), writ granted 435 So.2d 426 (La.1983), writ recalled 441 So.2d 737 (La.1983).
Among other considerations in Standard Printing, the expert had the benefit of answers given by some of that company's customers about the effect of relocating the business from downtown. There we approved the expert's opinion about the loss that that business sustained from the expropriation and his projection of what it would take to make Standard Printing "whole." Here we cannot approve that expert's opinion projecting the loss that Peacock's sustained from the burglary to 1990 because the measure of damages is narrower or more limited by law in this case.
In Standard Printing, the measure of damages was the broader and constitutionally provided "full extent of [the] loss." Here damages in tort are measured by principles of the Civil Code, as interpreted and applied in many cases since the adoption of the code. Recovery in tort in Louisiana is for actual and reasonably foreseeable damages.
Additionally, a plaintiff is required to mitigate its tort damages. Hogan Exploration v. Monroe Engineer. Assoc., 430 So.2d 696 (La.App. 2d Cir.1983). Recovery in tort for loss of income either from injury or destruction of property is allowed only for the time reasonably necessary for the property to be replaced. Louisiana Farm Bureau Mut. Ins. Co. v. Dunn, 484 So.2d 853 (La.App. 1st Cir.1986). The absence of funds with which to replace damaged or destroyed property cannot be used to extend beyond a reasonable time, the time that the property otherwise should have been replaced. Prothro v. Dillahunty, 488 So.2d 1163 (La.App. 2d Cir.1986); Meshell v. Insurance Co. of North America, 416 So.2d 1383 (La.App. 3d Cir.1982).
Tort damages for loss of income for a reasonable time have been allowed for property loss, but not when based on conjecture or when it is not shown that the loss of income, more probably than not, was attributable to a defendant's conduct or fault. See Meshell, supra; Austin's of Monroe, Inc. v. Brown, 474 So.2d 1383 (La.App. 2d Cir.1985); Southern Acoustics, Inc. v. Ritman, 272 So.2d 417 (La.App. 2d Cir.1973). Loss of projected gross profits, again only for a reasonable time, instead of net profits, may be employed to measure tort damages when the business and its normal overhead continues after the damage. Rosenblath v. Louisiana Bank & Trust Co., 432 So.2d 285 (La.App. 2d Cir.1983), and authorities cited therein.
An overriding standard of review is that when it is found, upon articulated reasons, that the trier of fact has abused its discretion by awarding excessive damages, the appellate court reduces the award to the highest amount that the appellate court would have affirmed as reasonable. Foster v. Lafayette Ins. Co., 504 So.2d 82 (La.App. 2d Cir.1987), citing Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976).
We shall articulate reasons why the trier of fact abused its discretion in this action. Reck v. Stevens, 373 So.2d 498 (La.1979).
According to Peacock's business practices, each store would reduce its inventory near the end of February of each year and would begin reordering merchandise for the peak Christmas season during the summer *408 months. Normally, about 40-45 percent of the inventory would be left in the store at the end of the fiscal year [February 28], because, a Peacock's executive explained, "you must [stock] two of [each] thing to sell one."
Peacock's gross sales, gross profit, and net income for the fiscal years 1978-1982 are compared:

FISCAL TOTAL GROSS NET
 YEAR SALES PROFIT INCOME
 1978 $1,041,000 $501,000 $56,000
 1979 1,219,000 591,000 39,000
 1980 1,455,000 603,000 33,000
 1981 2,044,000 957,000 -(22,000)
 1982 1,568,000 726,000 -(336,000)

Peacock's was paid $401,403 about February 1, 1983, and $42,100 before June 1, 1983, by St. Paul. Peacock's had more than $200,000 in an annuity account that was pledged to secure a debt. Peacock's explained that some of the funds available to it in 1983 had to be paid to creditors and cosignors. The lack of funds with which to replace a lost or damaged thing does not unduly extend the reasonable time that is deemed necessary for replacement or justify increased damages that are calculated on the basis of that reasonable time. See Prothro, supra; Louisiana Farm Bureau Mut. Ins. Co., supra. See also Menard v. Prejean, 374 So.2d 1275, 1277 (La.App. 3d Cir.1979):
[W]hile the lack of adequate finances to purchase a replacement [item] provoked much sympathy, the law does not support the inclusion of damages for the loss of use of such an item beyond a reasonable time that it would take for the replacement unit to be purchased had adequate finances been available.

An expert said that a jewelry store inventory can be acquired or replaced in two to three months. Most of the stolen items could have been replaced at original cost. The diamonds and watches cost $31,282 more to replace than the original cost. The proper measure of damages for the loss of an inventory that was for sale in the usual course of trade is the cost of replacement, without reduction for depreciation. See Petrol Industries v. Gearhart-Owen Industries, 424 So.2d 1059 (La.App. 2d Cir. 1982).
Peacock's argues it is patently unfair to conclude that Peacock's damages should be mitigated or limited by the time reasonably required for the inventory to be replaced because Peacock's "figures ... clearly show the impact of [the defendants'] fault extended well beyond that limited time [to 1990]." To support this argument, Peacock's draws an analogy to the "realm of compensation for personal injury" when the injured plaintiff has a residual disability and cannot earn wages for an extended period. Peacock's analogy is not well taken.
Destruction of or damage to property is susceptible of precise measurement. Damage to the person is not. CC Art. 1999. The principle that a tortfeasor takes his victim as he finds him has been often recognized in personal injury cases. We have not found that principle applied in a property damage case. Prothro, supra.
A plaintiff-obligee in tort must make reasonable efforts to mitigate the damages caused by a defendant-obligor in tort. CC Art. 2002. Damages ex-delicto are elucidated by CC Art. 1995-2003 since the codal amendments of 1984. The ordinarily negligent obligor in tort for property damage [akin to a good faith contractual obligor] should be responsible only for the reasonably foreseeable damage. CC Art. 1996. The intentional tortfeasor-obligor for damage to property [akin to the bad faith contractual obligor] may be liable for "all the damages, foreseeable or not, that are a direct consequence" of the tort. CC Art. 1997. This latter non-foreseeable or subjective victim standard we relate to the full extent-of-the-loss standard under the expropriation article of the constitution.
It could be said that the burglars were intentional tortfeasors who may be held responsible for all damages, foreseeable or not, that were a direct consequence of the burglary. These unforeseeable or subjective victim damages to the year 1990, in the eyes of this jury, totalled over $3,000,000. The ordinarily negligent tortfeasors, the three appellants, should be responsible only *409 for the lesser and more objective measure of actual and reasonably foreseeable damage to Peacock's property.
Peacock's economic expert and executives attributed the decline in its sales solely to the burglary and to Peacock's lack of funds to replace the stolen inventory of fine-quality goods. As we have said, damages for the loss of use of destroyed or damaged property are recoverable in a tort action, but only for the time reasonably necessary to replace that property. The measure of damages is by the objective, reasonable-victim standard and not by the subjective standard of a particular jewelry store with liquidity and cash flow problems. The record clearly establishes that Peacock's was experiencing such problems in the years before the burglary.
Peacock's debt had reached almost $1.4 million in 1982 before the burglary, primarily as a result of its financing the opening of the Shreve City store in 1976 and the South Park store in 1980. Peacock's fiscal year tax returns show that it paid approximately $200,000 in interest in FY 1981 and in FY 1982. Peacock's CPA acknowledged that Peacock's debt-service required "astronomical" and "tremendous" amounts of cash.
While many of the decisions of Peacock's to expend its profits produced favorable tax consequences and were made with professional advice, these decisions minimized the working capital and created a cash flow problem before the burglary made the problem even more acute.
We can hypothesize that the cash flow problem of one jewelry store that is the victim of a burglary may resolve itself in any number of years depending upon the circumstance of the individual store. This hypothesis supports application of the objective standard for measuring the reasonably foreseeable time to replace property that is destroyed or damaged by another's ordinary negligence.
Peacock's FY 1982 sales showed a decline before and after the burglary. The evidence shows that general external economic and financial conditions and particular internal financial cash flow problems, for which the defendants are not responsible, most probably contributed to the decline in sales after the calendar year 1982. Under these circumstances, the jury was clearly wrong in assessing damages at $2.6 million.
The damages to the Shreve City inventory and furnishings were calculated on the basis of Peacock's inventory and accounting figures. The cost price and replacement price of the merchandise that was stolen were determined. Some of the merchandise in the Shreve City store was temporarily there on loan from the other Peacock's stores. Some of the items stolen were on consignment from wholesalers (memorandum merchandise) and other items were items left by customers for repair or for appraisal. [Other items were personal items belonging to Peacock's officers.] Peacock's either paid its customers for the stolen customer items or replaced some of the customer items with inventory from its other stores that otherwise would have been available for sale.
Peacock's figures were as follows:

 SUMMARY OF BURGLARY
 REPLACEMENT
 COST
INVENTORY ITEMS:
 MEMORANDUM MERCHANDISE
 Shreve City $86,505.35
 Other Stores 93,666.00
 MERCHANDISE SETTLEMENTS
 WITH CUSTOMERS
 Shreve City $31,784.00
 Other Stores 3,243.34
 DIAMONDS, replacement cost 259,981.69
 WATCHES, replacement cost 160,581.69
 LAY-A-WAY MERCHANDISE 3,940.56
 MISCELLANEOUS MERCHANDISE 68,731.25
 ___________
 TOTAL $708,433.88
NON-INVENTORY ITEMS:
 FURNITURE & REPAIRS 11,307.54
 DEPOSIT 5,140.51
 CASH SETTLEMENTS WITH CUSTOMERS 2,680.69
 INSURANCE DEDUCTIBLE 7,500.00
 __________
 TOTAL $26,628.74
 GRAND TOTAL $735,062.62

Peacock's insurer paid the limits of its theft policy to Peacock's on these calculations:

Inventory and cash $432,558.89
Property Damage 10,945.97
 ___________
TOTAL $443,504.86

*410 St. Paul also paid Peacock's officers $19,147 for their personal jewelry that was stolen in the burglary.
On corporate tax returns after the burglary, Peacock's claimed $184,699 as "robbery expense" not covered or paid by theft insurance.

ASSESSMENT OF DAMAGES
Peacock's is entitled to recover for direct losses of non-inventory items, or $26,628.74, as itemized on page 43 supra.
Damages should also be assessed for the replacement cost of the stolen merchandise, or $708,433.88, as itemized on page 43, supra.
Peacock's had the entire proceeds of the St. Paul policy at its disposal certainly within six months of the loss. Most of the proceeds were paid within two months of the loss. We deem Peacock's, under objective standards, could have replaced most of its inventory many months before the Christmas sales period, December 1, 1983 February 28, 1984. Peacock's gross sales in fiscal year 1982-83 were only $475,641 less than in fiscal year 1981-82, Peacock's peak year. Its gross profit was only $231,325 less in FY 1982-83. Some of the decline in FY 1982-83 sales occurred before the burglary.
If all of the lost inventory had been sold the gross profit would have been more than in FY 1981-82, but Peacock's expected to sell, and by experience, sold, no more than 60 percent of its inventory in any fiscal year, according to its executives. If Peacock's had sold 60 percent of the stolen $700,000 inventory for $1,400,000 before the next Christmas season in 1983-84, its gross sales would have been $840,000 (60% of $1,400,000). Its gross profit would have been 47 percent of that figure, or $394,800.
At best, and employing the Coco v. Winston standard of review, any award for gross profits of more than $400,000 would be found unreasonable and an abuse of the jury's discretion.
Under the circumstances of this record, the highest award the jury could have made that we would deem reasonable for actual and foreseeable damages and within the jury's discretion would be:

Inventory loss $708,433.88
Gross profit loss 400,000.00
Non-inventory
 items 26,628.74
 _____________
 TOTAL $1,135,062.62

St. Paul was subrogated to $443,504 of the above amount and was subrogated to the $19,147 paid to the Peacock's owners under a home owner's policy. The judgment in favor of Peacock's shall be reduced by the $443,504 paid by St. Paul to award Peacock's maximum legally assessable damages of $691,558.62.

INTANGIBLE DAMAGE; LOSS OF REPUTATION
Peacock's executives deemed or felt that Peacock's lost customers and good will because of the publicity about the burglary, the shortage of inventory at the three stores, and the loss of public and customer confidence in the security of the store and merchandise left there for appraisal or repair. Peacock's offered its customers who had left jewelry in the store for repair or appraisal the alternative of cash or replacement.
Peacock's customers, potential and actual, did not testify and were not surveyed by Peacock's expert as were the customers of Standard Printing Company, supra. Should the jury have included in its award an amount for these "feelings" by Peacock's executives, we would find the jury clearly wrong. This record does not allow the conclusion that Peacock's proved by a preponderance of the evidence that it sustained any damage to its good will, its reputation, or to any other intangible such as public or customer confidence because of the burglary. Even if we assume that such damages are foreseeable and recoverable in this action, the possibility or "feeling" that such damages were sustained is not sufficient to prove such damages. Meyers v. Imperial Cas. Indem. Co., 451 So.2d 649 (La.App. 3d Cir.1984).

*411 DECREE
The judgment is amended to award legal interest against all solidary defendants from the date of judicial demand upon the first solidary defendant. The judgment is further amended to reduce the award to Peacock's from $2,628,136 to $691,558.62, and in all other respects is affirmed. Costs of this appeal are assessed one-half to Peacock's and one-half to defendants.
AMENDED in part and AFFIRMED.