576 So.2d 77 (1991)
Carl Edward NOWELL, Jr., et ux., Plaintiffs-Appellants,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al., Defendants-Appellees.
No. 22186-CA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 1991.
Rehearing Denied March 28, 1991.
Writ Denied May 31, 1991.
*78 Troy E. Bain and Walker, Tooke, Perlman, Lyons and Greer by Laurie W. Lyons, Shreveport, for plaintiffs-appellants.
Lunn, Irion, Johnson, Salley & Carlisle by Marshall R. Pearce, Shreveport, for defendants-appellees Carl Nowell, III and State Farm Ins.
Bodenheimer, Jones, Klotz & Simmons by Frank H. Thaxton, III and Mary L. Coon Blackley, Shreveport, for defendants-appellees Cuestas, Inc. and Guaranty Nat. Ins. Co.
Before MARVIN, C.J., and NORRIS and BROWN, JJ.
*79 MARVIN, Chief Judge.
In a wrongful death and survival action arising out of a one-car accident, the mother and father of the decedent, their 25-year-old son, appeal a judgment based on a jury verdict. Appellants seek to increase the amounts awarded them and to reduce the allocation of 30 percent of the fault to the decedent.
The decedent, Mark Nowell, was a passenger in the car owned and being driven by his older brother, Carl Nowell. In answer to interrogatories, the jury also allocated 45 percent of the fault to Carl Nowell, who earlier had consumed some beer and who was speeding when he lost control of his car, and 25 percent of the fault to the ambulance company that negligently handled the critically injured decedent at the accident scene.
In addition to medical and funeral expenses, the judgment awarded the parents $10,000 for the decedent's conscious pain and suffering and general damages of $20,000 to the father and $40,000 to the mother of decedent. Appellants also complain of the manner in which the trial court fixed and assessed costs.
We amend the judgment to increase the wrongful death awards to each parent and re-allocate fault solely between defendants.

FACTS
The decedent, Mark Nowell, lived in the family residence of his older brother, Carl Nowell III, in Longview, Texas, where Carl had helped Mark find gainful employment. On the morning of May 31, 1982, Carl drove his wife and children and Mark to Coushatta to attend a gathering of Carl's wife's family. There both Carl and Mark drank one or more beers during the afternoon. An argument between Carl and his wife caused Carl to leave his wife and children at the gathering and to drive back to Longview, about a two-hour drive. Mark accompanied him. Neither drank anything on the trip to Longview.
After arriving in Longview around 8:00 p.m., Carl and Mark parted for three or four hours. Carl drank "a couple of beers" while being tattooed in a Longview establishment before he returned home about midnight. There he drank a beer in Mark's presence and discussed with Mark his having left his wife and children in Coushatta. He persuaded Mark to again accompany him and the two of them left from Longview for Coushatta, where Carl intended to "make up" with his wife, about 1:00 a.m. June 1.
While on La. Hwy. 1 almost nine miles south of the city limits of Shreveport, Carl apparently swerved his car on the highway and lost control at about 2:45 a.m. The time and distance from Longview does not indicate that Carl had been speeding during the return trip toward Coushatta. The state trooper who investigated the accident estimated that Carl's car was traveling at a high speed, perhaps 90 mph, when it veered off and back onto the paved highway and then into a cotton field where it rolled over several times before coming to a stop. Carl's wrecked automobile was found some 585 feet away from the point where it left the paved highway. Mark was propelled from the car which rolled over him, crushing and seriously injuring him. Carl was also thrown from the car. His injuries, less serious than Mark's, limited his memory of the accident to only a vague and general recall of his swerving and losing control of his car.
The state trooper arrived at the scene at 3:18 a.m. and immediately radioed for an ambulance. Responding to the trooper's radio call, two attendants in an ambulance of the defendant ambulance company arrived from Shreveport at the scene at 3:36 a.m., within 18 minutes of the trooper's call. The ambulance attendants used critical time arguing with each other about the best way to move and handle Carl and Mark, because one of the two backboards routinely stored in the ambulance had not been returned to the ambulance from a Shreveport hospital where they had made an earlier delivery. Eventually and while awaiting the arrival of a second ambulance with additional backboards, the one backboard was used to support Mark who was then placed on the bench in the ambulance. Mark, unfortunately, was not strapped or *80 otherwise secured to the bench even though he had been "combative," waving his extremities while the attendants treated and moved him. When he was left alone and unsecured on the bench Mark fell face down on the floor of the ambulance and began coughing up blood, a symptom he had not before demonstrated. The attendants returned him to the bench, strapping and securing him on this occasion.
As the second ambulance arrived, the ambulance containing Mark departed the scene at 4:44 a.m. Mark's ambulance arrived at the Schumpert hospital emergency room at 5:40 a.m., more than two hours after its arrival at the accident scene. Mark went into cardiac arrest at 6:10 a.m. and was pronounced dead at 7:01 a.m. on June 1, 1982.
Mark's injuries included a fractured leg, seven fractured ribs, one of which was dislocated, and lung punctures. Dr. George McCormick, a forensic pathologist who later was elected Caddo Parish coroner, opined that Mark's death was caused by the loss of blood from two major lung punctures. While Dr. McCormick agreed that Mark may have had minor or slight lung punctures before he fell from the ambulance bench, he opined that the minor punctures caused very little or no loss of blood. He concluded that the blood loss was produced from one or more of the broken ribs causing the major punctures when Mark rolled off the ambulance bench and fell to the floor.

FAULT OF DEFENDANTS
We have no difficulty concluding that the jury correctly found both defendants at fault. The record supports the conclusion that Carl had been drinking and was driving too fast and lost control of his automobile. The record also supports the conclusion that the ambulance attendants did not exercise reasonable care because the second backboard was not in the ambulance, they wasted critical time at the scene and otherwise improperly administered treatment, and they did not secure Mark to the bench on the first occasion.
The jury could have accepted the testimony of Dr. McCormick that the neglect of the ambulance attendants substantially contributed to the cause of Mark's death. This record supports the conclusion that they neglected to timely and properly treat, secure, and transport Mark and that this combined neglect was a substantial cause of Mark's death.
The defendant ambulance company was a successive tortfeasor to Carl Nowell. Garrett v. Safeco Ins. Co., 433 So.2d 209 (La.App. 2d Cir.1983). Each tortfeasor, however, is solidarily liable to the injured or deceased victim. Weber v. Charity Hosp. of Louisiana, 475 So.2d 1047 (La. 1985); Maxwell v. Soileau, 561 So.2d 1378 (La.App. 2d Cir.1990), writ denied.

MARK'S FAULT
A decedent is entitled to the presumption that he would conduct himself reasonably and prudently in all respects to preserve his safety and his life. Kincade v. Doll, 472 So.2d 60 (La.App. 4th Cir.1985), writ denied.
The negligence of a motorist is not imputable to his guest passenger because it is unrealistic to hold that the passenger factually has any control or right of control over the motorist with whom he rides. In the ordinary situation, a passenger is at the mercy of his driver, but there are unusual, special and out-of-the-ordinary situations where a passenger's voluntary assumption of a known risk amounts to contributory negligence for his failure to protest or otherwise negate the risk. The passenger has a duty to avoid knowingly exposing himself to the risk of riding with an intoxicated driver. The passenger may have a duty to protest other conduct of the driver, such as excessive speed. See Adams v. Security Ins. Co. of Hartford, 543 So.2d 480 (La.1989), and cases cited and discussed therein.
The fact that a plaintiff may, or should, have been aware of the risk created by the defendant's condition or conduct is not a total bar to plaintiff's recovery, but is one of several factors to be considered in *81 comparing and allocating fault. Molbert v. Toepfer, 550 So.2d 183 (La.1989); Daugherty v. Cas. Reciprocal Exch. Ins., 522 So.2d 1323 (La.App. 2d Cir.1988). If alcohol-induced impairment of the motorist is a substantial cause of the driver's negligence and if the passenger knows or should have known of the driver's impaired condition and nevertheless voluntarily rides with him, the passenger may be found comparatively negligent or at fault. Molbert, supra; Daugherty, supra. The burden of proof rests with the defendant.
Mark drank some beer and knew that Carl drank some beer at the gathering in Coushatta before they left about 6:00 p.m. Neither drank during the approximate two-hour trip to Longview. The record suggests that this trip was uneventful. Mark knew that Carl left their Longview home for several hours but did not know where he went. Carl showed Mark his tattoo when he returned home but did not tell Mark that he had had a "couple of beers" while he was gone. Mark saw Carl drink one beer after Carl returned to their Longview home. Carl did not say or otherwise indicate to Mark that he was under the influence of alcohol. Carl said he felt that he was capable of driving and would not have driven had he felt otherwise. He said Mark did not question Carl's ability to drive or ask him to slow down on the way to Coushatta. The record does not show or suggest that Carl drove erratically or imprudently before he swerved the car while traveling at a high rate of speed when he was within 30 miles or so of Coushatta.
A test of Mark's blood revealed no alcohol. The results of Carl's blood alcohol test were attached as a supplement to the police report but were not introduced in evidence. The state trooper indicated on the report that Carl "had been drinking" but did not recall the basis for his notation, saying he may have smelled alcohol on Carl's breath or Carl may have told him he had been drinking. The trooper did not recall why he requested the blood alcohol test on Carl. He said it was "standard" to request one when any of the vehicle's occupants are seriously injured. Carl was charged with and later pleaded guilty to DWI.
The record does not allow the conclusion that Carl drank a substantially greater quantity of beer at the Coushatta gathering than did Mark. In the light that most favorably supports the judgment, the record shows that after they left Coushatta about 6:00 p.m. Carl drank three, perhaps four beers between 8:00 p.m. and 1:00 a.m. (he says "one" at home after midnight and "a couple" before going home). The accident occurred about 2:45 a.m. Mark was sober. The degree to which Carl may have been demonstrably impaired by alcohol at any given time between midnight and 2:45 a.m., when he was in Mark's presence, cannot be discerned on this record.
Under these circumstances, which we consider in the light of the circumstances of the several cases that are cited as being collaterally in point, the evidence cannot preponderate that Carl was impaired by alcohol to such a degree that his conduct and his driving would cause Mark to know, actually or constructively, of Carl's condition so as to support the finding that Mark was comparatively negligent either in riding with Carl or in not protesting Carl's driving and offering to drive himself. Rosell v. ESCO, 549 So.2d 840 (La.1989). Each case must stand on its own facts. See and compare Molbert v. Toepfer and Daugherty v. Cas. Reciprocal Exch. Ins., both cited supra.
The jury was clearly wrong in assessing any fault to the decedent, Mark Nowell. We shall amend the judgment to re-allocate fault.

FAULT RE-ALLOCATION
Defendant Carl Nowell argues that the appellants have not specifically assigned error dealing with the fault or re-allocation of Carl Nowell's fault and that we cannot re-allocate his fault. We further note that neither defendant answered the appeal to complain about the allocation of fault or to seek to increase the fault of the other defendant or of the decedent. Notwithstanding his argument and our observation, *82 we do not agree with Carl Nowell's argument for these reasons:
Plaintiffs' first assignment asserts that any allocation of fault to Mark Nowell was error, while the second assignment seeks to increase the fault of the defendant ambulance company. We have found the jury clearly wrong in allocating any fault to the decedent, the effect of which increases the combined fault of the two defendants from 70 percent to 100 percent. This allocation of 100 percent fault to defendants is squarely within appellants' assignment and our appellate authority.
The purpose of assessing fault against all persons whose fault contributes to an injury to a non-negligent plaintiff is to allow the faulty parties to apportion and claim contribution between themselves, and, as well, to claim credit for what a non-party, found liable to plaintiff, may have paid plaintiff. Peacock's Inc. v. Shreveport Alarm Co., 510 So.2d 387, 405 (La.App. 2d Cir.1987), writ denied. While third-party demands were filed below, the judgment appealed does not mention them and the litigants do not assign any error regarding them.
As between themselves, the two defendants were found 70 percent at fault by the jury and in the judgment, in the ratio of about twice as much fault to Carl (45 percent) as to the defendant ambulance company (25 percent). These are factual findings which are supported and which we do not disturb, even though other finders of fact may allocate fault in a different ratio. Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984). Nonetheless, and while perhaps recognizing in the abstract the arguable validity of Carl Nowell's argument, we have the authority to re-allocate to these two defendants the ratio of fault found by the jury which ratio we have affirmed. That fault is re-allocated in the same ratio, 45/70 of the combined 100 percent fault to Carl Nowell and 25/70 of the combined fault to the ambulance company. See Peacock's Inc., supra; CCP Art. 2164.

THE DAMAGE AWARDS
The jury awarded $10,000 for Mark's conscious pain and suffering, $20,000 for his father's general damages and $40,000 for his mother's general damages. The parents seek to increase these awards and contend the trial court erroneously excluded evidence they sought to introduce on the issue of their general damages.
After Mark's death, his father developed bladder cancer and had a heart attack, and his mother's rheumatoid arthritis worsened. Plaintiffs sought to introduce the medical records of these illnesses as well as expert testimony from Dr. McCormick that the stress and depression the parents experienced after Mark's death may have caused or contributed to their physical illnesses. Defendants objected to the evidence as irrelevant, arguing that the parents could not legally recover damages for their own physical illnesses in this action for their son's wrongful death. The trial court sustained the objection and allowed plaintiffs to make a proffer under CCP Art. 1636.
Plaintiffs concede, as they did in the trial court, that they may not recover damages for their own physical illnesses per se. They argue, however, that the evidence was admissible for the limited purpose of showing the extent of the impact that Mark's death had on them.
Assuming without deciding that the evidence was relevant for the limited purpose for which it was offered, we nevertheless find no reversible error in the trial court's exclusion of it in this jury trial. LCE Art. 403 allows otherwise relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ..." Plaintiffs argue here that any confusion could have been avoided by giving a limiting instruction to the jury, but did not request such an instruction in the trial court. The jury heard the parents and a psychiatrist who evaluated them four years after Mark's death testify that Mark's death had a profound and long-lasting impact on them.
*83 On this record, we find that any error in the trial court's exclusion of the proffered evidence was harmless. See and compare Morris v. Yogi Bear's Jelly stone Park, 539 So.2d 70 (La.App. 5th Cir.1989), writ denied. We distinguish Lang v. Prince, 447 So.2d 1112 (La.App. 1st Cir.1984), writ denied, cited by plaintiffs. The general damage award to the mother in Lang was based in part on evidence that she had migraine headaches, anxiety, vomiting and fainting spells after her son's death. Lang was tried by judge, not by jury, apparently without objection to the evidence of the mother's illnesses.
Even without the proffered evidence, however, we find the general damage awards for the mental anguish and loss of love and affection of Mark's parents to be inadequate, for reasons we articulate under Reck v. Stevens, 373 So.2d 498 (La. 1979).
Mark was born in 1957 and lived with his parents until he turned 18 in 1975. During most of that time, his father was in the Navy and was frequently away from the family home in Virginia Beach, Virginia. Mr. Nowell served two one-year tours of duty in Vietnam, the first in 1967 and the second in 1970. In the interim, he was stationed in Germany, where the whole family lived for about two years. While in Europe, the family traveled extensively when Mr. Nowell was not on duty.
Mr. Nowell retired from the Navy in 1973, when Mark was 16. His adjustment from military to civilian life was apparently difficult for the whole family, including Mark, whose personality changed from "easy-going" to "moody and belligerent," according to his mother. Both Mrs. Nowell and Mark attended private counseling for about nine months, after which Mark became "more easy-going."
Mark was an active child but was not a good student. He quit school at age 18 and moved into an apartment with friends. He continued to have frequent contact with his parents, sometimes helping his father with yard work or house painting. Mark had several jobs during this time, including a job as a deckhand on a tugboat his father operated.
Mark moved to Florida in search of a job in the late 1970's, at about age 20. He kept in touch with his parents weekly, by phone or letter, and visited them in Virginia several times, until he was arrested and jailed in Florida, apparently in 1981. Mark did not tell his parents he was in jail, later saying that he was ashamed to tell them. His mother learned he was in jail when she tried to reach him at work after several weeks without contact from him. Mark did not tell his parents why he was in jail and declined their offers to post bond or to visit him in jail. He asked them to send him money for cigarettes and personal items, which they did.
When Mark was released from jail in April 1982, he moved to Longview, Texas, where he lived with his brother Carl's family for about two months before his death. Mark called his parents when he arrived in Longview and had spoken to them two days before his death to say that he and Carl would come to Virginia for their father's college graduation in early June.
At trial in 1989, seven years after Mark's death, Mr. and Mrs. Nowell continued to have difficulties accepting Mark's death, particularly at holiday times, although their difficulties had diminished since the first year. They were evaluated by Dr. Paul Ware, a Shreveport psychiatrist, in 1986. Dr. Ware found that Mrs. Nowell was clinically depressed and "stuck" in the early stages of the grieving process, still expecting Mark to come home and keeping his room and his clothes ready for him four years after his death. Dr. Ware found that Mr. Nowell had begun to move from denying to accepting Mark's death but felt guilty about being away from home during his naval career.
Both parents told Dr. Ware that they knew very little about how the accident happened because Carl was reluctant to talk about it and they did not want to force him to do so. Mr. Nowell expressed some anger at Carl, while Mrs. Nowell blamed the hospital and the ambulance company for Mark's death. Dr. Ware recommended *84 that the Nowells seek counseling in Virginia and that they talk to Carl about the accident, which they had not done by the time of trial in 1989, notwithstanding that Carl and his family had moved back to Virginia in 1985 and lived less than five miles from Mr. and Mrs. Nowell.
While Mark had not lived with his parents for seven years before his death, the evidence shows that he had regular contact with them except for a brief period when he did not want them to know he was in jail. His relationship with his parents was neither unusually close nor unusually distant, although he was somewhat closer to his mother than to his father. On this record, we find the awards of $20,000 to Mr. Nowell and $40,000 to Mrs. Nowell to be inadequate. We shall amend the judgment to increase Mr. Nowell's award to $40,000 and Mrs. Nowell's award to $50,000. Reck v. Stevens, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976).
See and compare Durrett v. State, 416 So.2d 562 (La.App. 1st Cir.1982), writ denied, (increasing from $40,000 to $60,000 the award to each parent for the loss of their 20-year-old daughter who lived on a local college campus and had a "very close" relationship with her parents); Slider v. Myers, 557 So.2d 1111 (La.App. 2d Cir. 1990), (increasing from $30,000 to $60,000 the award for a mother's loss of her 23-year-old "slightly retarded" son who lived with her, helped around the house, and contributed part of his government check toward her support); Motton v. Travelers Ins. Co., 484 So.2d 816 (La.App. 1st Cir. 1986), (affirming, as neither excessive nor inadequate, a $60,000 award to the mother who had lived next door to her 32-year-old daughter and had seen her daily); Thibodeaux v. Police Jury, 561 So.2d 163 (La. App. 3d Cir. 1990), writ denied, (finding no inadequacy in awards of $115,000 to the father and $125,000 to the mother who had a "close relationship" with their 15-year-old son); and Siemann v. Teston, 517 So.2d 242 (La.App. 1st Cir. 1987), (reducing from $250,000 to $150,000 the award to the widowed mother of a 16-year-old daughter with whom she had "an unusually close and unique relationship").
The $10,000 award for Mark's conscious pain and suffering is not abusively low.

EXPERT WITNESS FEE
Plaintiffs seek an increase in the expert witness fee for Dr. McCormick from $800 to $1,575, the amount he charged for his services. The parties stipulated that Dr. McCormick charged $150 per hour and spent a total of 10.5 hours on the case, including two hours testifying at trial and two hours in a pre-trial conference with plaintiffs' attorneys a few days before trial. The charges for the time associated with trial total $600, which is less than the trial court's $800 award. We find no abuse of discretion in the court's failure to award plaintiffs the entire amount of Dr. McCormick's bill. See and compare State, through Dept. of Highways v. Bray, 511 So.2d 1300 (La.App. 2d Cir. 1987), writ denied.

COSTS
Plaintiffs also complain that they were cast with 30 percent of the costs incurred in the trial court, corresponding to the jury's allocation of 30 percent fault to Mark. Having found that Mark was not at fault we do not assess plaintiffs with costs. We amend the judgment to re-allocate all costs 45/70 to Carl Nowell and 25/70 to the defendant ambulance company.

DECREE
The judgment is amended to increase the award to Mrs. Nowell to $50,000 and the award to Mr. Nowell to $40,000 and to re-allocate fault 45/70 to Carl Nowell and 25/70 to the defendant ambulance company.
As amended, the judgment is AFFIRMED.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, NORRIS, VICTORY and BROWN, JJ.
Rehearing denied.