LOVE, J., CONCURS IN PART AND DISSENTS IN PART
LOVE, J., CONCURS IN PART AND DISSENTS IN PART
I respectfully concur in part and dissent in part. I agree with the majority that genuine issues of material fact exist as to Dr. Thomas Bayer which precludes granting of summary judgment in the defendants favor. Unlike the majority, however, I find genuine issues of material fact also exist as to Dr. Laura Kelley. The trial court relied on Prather v. Audubon Ins. Co. , 488 So.2d 383 (La. App. 3rd Cir. 1986), and the proximity test to grant defendants' motion for summary judgment. I find the trial court's reliance on Prather misplaced. In Prather , it took the plaintiff 35 minutes to arrive at the accident scene and no evidence was offered as proof of mental anguish. By contrast, Dr. Bayer arrived at *51 the home within seven minutes of learning of the accident and Dr. Kelley arriving quickly after Dr. Bayer's arrival. This case is further distinguished from Prather as the plaintiff's claim in that case was based solely on mental anguish and did not seek recovery for inconvenience or loss of use.
I find this case is more analogous to Sierra v. American Alternative Ins.Corp. , 13-1808 (La. App. 1 Cir. 6/16/14), 147 So.3d 1125. The Sierras were at the hospital when they learned that a fire truck crashed through an exterior wall of their home. Like Drs. Bayer and Kelley, the Sierras rushed to home to find many people at their home, including firemen who were working at the site of the crash. Also like Drs. Bayer and Kelley, the Sierras sustained such damage that they could not live in their home while it was being repaired.
Drs. Bayer and Kelley testified concerning the extreme stress they experienced as a result of the damage to their home. Both individuals arrived within seven minutes of being informed that their house was on fire. Dr. Kelley testified that she when she arrived at the house and learned that someone from Cimarron cut a live gas line causing an explosion, she feared the worst. She testified that she arrived to a scene "fraught with chaos" and feared that someone may have died. Dr. Bayer testified that he arrived on the scene as firemen were attempting to break down the front door.
Drs. Bayer and Kelley both testified to their loss of permanency, the strain placed on their relationship, and Dr. Bayer's worries about the disruption, inconvenience, and discomfort caused to his tenants.[1] They indicated that they were displaced from the property for seven weeks, during which time they were provided alternative housing. Nevertheless, they were forced to repeatedly pack up and move from one hotel to the next six times in the first ten days.
They both testified to the disruption the accident caused to their daily activities and the careers. Dr. Bayer testified that he usually spends his summers traveling; however, because of the incident he was forced to refocus his activities, including supervising the repair work. Additionally, his insurance would not cover his extensive art collection and other valuables in his home during the repairs because the home was without a working security system as a result of the accident and the City turning off the electricity to his home. Because he had no other means to protect his collection, he was constantly worried that his possessions would be stolen. Consequently, he would arrive at the home early in the morning and stay late into the night. He explained that his time at the home was insufferable due to the excessive heat as a result of no electricity or use of a bathroom or running water. He would also randomly visit in the middle of the night to create a pattern of irregularity to deter anyone from stealing from the home, which contributed to his worries and lack of sleep. Dr. Bayer also testified that while he regularly had his blood pressure checked, during the time in question, his doctor noticed his blood pressure was higher than normal. He indicated that his doctor attributed the spike in his blood pressure to stress relating to the fire. As a result, he was placed on medication until it normalized later in the year.
Dr. Kelley also testified that she experienced stress, disappointment, and frustration *52 after being displaced from her home. She testified to the extreme pressures she was under as a result of being displaced from her home and her office. She testified that her office was in their home and because the home (as mentioned above) was inhabitable it caused significant disruption to her professional career. When the accident occurred, Dr. Kelley was recently named the academic director for Tulane's summer study abroad program in Dublin. It was her first tenure in the role, and she was responsible for creating a curriculum for the entire program. She explained that repeatedly moving from one hotel to the next and the loss of permanency was extremely stressful while trying to plan an entire program curriculum, prepare lesson plans for two courses she would teach, create the necessary course materials, lectures, and plan excursions and field trips without the ability to work from her home office, which contained many of the resources and materials she needed to direct the new program. Dr. Kelley testified to the strain the situation placed on her relationship with Dr. Bayer as he took on everything so that she could try to focus on getting her program ready for the students that summer.
Dr. Kelley's loss of the use of her office, which was set up for her specific health needs, also contributed to the stress and anguish attendant to the property damage. She testified that she has a treadmill work station in her home office that she uses to assist with her back pain. She testified that the fire deprived her of the use of her home office, exacerbating problems with her back. She indicated that she visited the chiropractor twice after the accident to address issues she began having after the accident. She testified that she carries stress in her shoulders and also began getting headaches after the fire. Further, Dr. Kelley testified about lingering anxiety she experienced when defendants began work in other parts of the neighborhood, fearing that another explosion and fire might occur.
Review of the trial court's written reasons demonstrates that it erroneously weighed the evidence and made certain factual determinations. I find the foregoing testimony sets forth sufficient evidence from which a trier of fact may reasonably conclude that Drs. Bayer and Kelley suffered mental anguish and emotional distress that amounted to more than minimal worry of being displaced from their home. A trier of fact may reasonably conclude that the anguish was a direct result of being dispossessed of their home. Therefore, I conclude there is sufficient evidence showing in the record to preclude summary judgment as it relates to the claims of Drs. Bayer and Kelley. Accordingly, I concur in part and dissent in part.

Dr. Bayer testified to having stressful and confrontational interactions with defendants regarding how they were treating his tenants, one of whom was a law student in the midst of her final law exams.