| | | |
|---|---|---|
| STUART GIGNILLIAT AND KASEY GIGNILLIAT | * | NO. 2025-CA-0593 |
| | * | |
| | | COURT OF APPEAL |
| VERSUS | * | |
| | | FOURTH CIRCUIT |
| | * | |
| AMERICAN ECONOMY INSURANCE COMPANY, FERTILITY INSTITUTE OF NEW ORLEANS, OVATION FERTILITY, AND TEXAS FERTILITY CENTER | * * * * | STATE OF LOUISIANA |
| | * * * | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2018-00924, DIVISION "A-16"
Honorable Ellen M Hazeur, Judge
* * * * * *
**Judge Joy Cossich Lobrano**
* * * * * *

(Court composed of Judge Joy Cossich Lobrano, Judge Tiffany Gautier Chase, Judge Monique G. Morial)

Conrad Meyer
Sarah J.L. Christakis
CHEHARDY, SHERMAN, WILLIAMS, MURRAY, RECILE, STAKELUM & HAYES, L.L.P.
One Galleria Boulevard, Suite 1100
Metairie, LA 70001

       COUNSEL FOR APPELLEE/FERTILITY INSTITUTE OF
       NEW ORLEANS

Lorraine P. McInnis
Micholle W. Mordock
Lance V. Licciardi Jr.
BRADLEY MURCHISON KELLY & SHEA LLC
1100 Poydras Street, Suite 2700
New Orleans, LA 70163-2700

       COUNSEL FOR APPELLANT/ FPG SERVICES, LLC d/b/a OVATION
       FERTILITY and FPG LABS, LLC d/b/a OVATION FERTILITY

**REVERSED AND REMANDED**
**MARCH 20, 2026**

Defendants/Appellants FPG Services, LLC d/b/a Ovation Fertility and FPG Labs, LLC d/b/a Ovation Fertility (collectively "Ovation") appeal the district court's June 5, 2025 judgment granting the motion for summary judgment filed by defendant Fertility Institute of New Orleans ("FINO") and dismissing, with prejudice, both the claims of plaintiffs Stuart and Kasey Gignilliat and Ovation's cross claims against FINO. For the reasons that follow, we reverse the judgment of the district court and remand this matter for further proceedings consistent with this opinion.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs Stuart and Kasey Gignilliat (collectively "Plaintiffs") came to FINO in January 2014 seeking in vitro fertilization ("IVF") and surrogacy services. In May 2014, Mrs. Gignilliat underwent egg retrieval, and six embryos were cryopreserved in FINO's laboratory in June 2014. FINO later determined that it had failed to evaluate the embryos for infectious disease as required by the Food and Drug Administration ("FDA"). This failure made the first set of six embryos

ineligible for transfer to a gestational surrogate.

FINO did not report the compliance failure to the FDA or seek an available exemption. Instead, FINO marked the embryos for "sexually intimate partner use" only and offered Plaintiffs a complimentary second egg retrieval.

The second egg retrieval, performed in September 2014, produced six additional embryos. Preimplantation genetic diagnosis ("PGD") testing[1] showed that three of the six embryos were genetically normal. FINO transferred one of the normal embryos to Plaintiffs' gestational surrogate that same month, which resulted in a miscarriage. Plaintiffs then decided to change doctors and move their remaining embryos to Ovation in Texas.

On March 5, 2015, Plaintiffs signed consents to transfer all eleven remaining embryos from FINO to Ovation. Shortly after, Ovation thawed and transferred one viable embryo to the surrogate, resulting in the birth of a healthy daughter. At that time, Plaintiffs believed they had one remaining viable embryo, three non-viable embryos, and the original six embryos that could not be used with a surrogate because of FINO's failure to properly screen them.

In March 2017, Plaintiffs arranged for transfer of what they believed to be their one remaining viable embryo to the surrogate. When an Ovation embryologist thawed the Cryotip device in which the embryo was believed to be housed, no embryo was found. According to Plaintiffs' petition, two embryologists searched

---

[1] PGD screening is a test performed to identify any chromosomal abnormalities or specific genetic conditions.

and flushed the device but found no evidence that an embryo had ever been loaded into the cane. The transfer did not occur.

On January 30, 2018, Plaintiffs filed this lawsuit. In their petition, Plaintiffs allege that FINO and Ovation each breached the applicable standard of care in handling Plaintiffs' embryos. The petition asserted four theories of negligence, directed at both defendants and, with the exception of a single reference in subsection (c), consistently framed those allegations in terms of the Gignilliats' "embryos" in the plural:

a. Failing to properly store and/or cryopreserve the Gignilliats' embryos;
b. Negligently handling, packaging, or shipping the Gignilliats' embryos;
c. Negligently losing the Gignilliats' embryo; and/or
d. Failing to institute proper procedures or protocols in the embryology laboratory to prevent the loss or destruction of human embryos.

The petition was supplemented and amended, but the amendment was limited to Paragraph 24, which addresses damages. The operative allegations giving rise to the asserted causes of action were not altered, and in all other respects Plaintiffs' petition, including the theories of negligence identified, has remained the same and has never been formally amended.

FINO and Ovation both filed answers to Plaintiffs' petition and cross claims against each other.

After discovery, FINO moved for summary judgment. FINO argued that neither Plaintiffs nor Ovation had produced expert testimony establishing that FINO caused the physical loss of the single embryo associated with the March 2017 thaw at Ovation. Ovation opposed the motion. Plaintiffs filed a written

response expressly adopting Ovation's opposition "insofar as Ovation's arguments relate to Plaintiffs' claims against FINO as stated in Plaintiffs' Petition for Damages," and specifically referenced all four theories of negligence asserted in the petition.

The motion was heard on May 16, 2025. At the outset, the district court and the parties addressed the scope of Plaintiffs' claims. FINO contended that Plaintiffs' case is only about the physical loss of the single embryo in 2017. The district court questioned whether the case had been so narrowed, noting that FINO's framing of the case did not comport with the broader allegations in Plaintiffs' petition. Ovation argued that Plaintiffs' petition and Ovation's cross claim encompassed FINO's conduct as to the full complement of embryos, including the first six embryos cryopreserved in June 2014.

After FINO and Ovation presented arguments, Plaintiffs' counsel, who was present at the hearing, addressed the scope issue. Counsel acknowledged the matter was "confusing" and stated, in part:

> "[T]he suit concerns the one embryo that got lost on the morning of the transfer in March of 2017… [W]e're only adopting [Ovation's] opposition to the extent that they're pointing to [sic] the finger at FINO with respect to the loss -- the actual loss of that one embryo that was supposed to be there in the transfer that morning.

In its oral reasons for granting FINO's summary judgment motion, the district court found this oral statement as limiting Plaintiffs' claims to the 2017 embryo loss. On June 5, 2025, the district court signed a judgment granting FINO's motion for summary judgment and dismissing with prejudice both Plaintiffs' claims and Ovation's cross claims against FINO. Ovation timely filed this appeal.

## STANDARD OF REVIEW

4

Appellate courts review summary judgment *de novo*, applying the same criteria used by the district court in determining whether summary judgment is appropriate. Under La. C.C.P. art. 966(A)(3), summary judgment shall be granted "if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law."

A "genuine issue" is one as to which reasonable persons could disagree. *Bayer v. Starr Int'l Corp.*, 17-0948, p. 3 (La. App. 4 Cir. 5/2/18), 246 So.3d 46, 49 (quoting *Ducote v. Boleware*, 15-0764, p. 6 (La. App. 4 Cir. 2/17/16), 216 So.3d 934, 939). If reasonable persons could reach only one conclusion on the evidence, summary judgment is appropriate. *Id.* In conducting this review, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Cutrone v. English Turn Prop. Owners Assoc., Inc.*, 19-0896, p. 8 (La. App. 4 Cir. 3/4/20), 293 So.3d 1209, 1215. Courts cannot not weigh evidence, make credibility determinations, or choose among competing reasonable inferences in deciding a motion for summary judgment. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751 (internal citations omitted).

Additionally, the mover bears the initial burden of showing the absence of a genuine issue of material fact. La. C.C.P. art. 966 (D)(1). If the mover will not bear the burden of proof at trial, the mover need only point out an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. *Id.* If the mover satisfies this burden, the non-moving party must produce factual support sufficient to establish that he or she will be able to satisfy the evidentiary burden at trial. *Id.* When, as here, causation and comparative fault are

at issue, summary judgment is appropriate only in the clearest of cases. *Berthiaume v. Gros*, 15-116, p. 5 (La. App. 3 Cir. 6/3/15), 165 So.3d 1275, 1278 ("Where reasonable minds could differ as to comparative fault of the parties, summary judgment is inappropriate."); *See also Palazzo v. Baker*, 94-1244, p. 6 (La. App. 4 Cir. 1/31/95), 652 So.2d 10, 13 (explaining that a determination of tort liability for summary judgment purposes requires complete resolution of comparative fault between the parties) (citing *Williams v. City of New Orleans*, 93-2043 (La. App. 4 Cir. 5/17/94), 637 So.2d 1130, 1132).

Guided by these principles, we consider whether the district court properly narrowed the scope of the case based on Plaintiffs' counsel's oral statement and whether genuine issues of material fact preclude summary judgment in FINO's favor.

## DISCUSSION

Ovation assigns three errors on appeal: (1) the district court's dismissal of all claims against FINO, including both Plaintiffs' claims and Ovation's cross claims; (2) the district court's finding that no genuine issues of material fact exist; and (3) the district court's decision to narrow the scope of the case to the loss of a single embryo in March 2017. Because the scope of the pleadings informs the analysis of the remaining issues, we address Ovation's third assignment of error first. We then consider the effect of that ruling on the dismissal of Ovation's cross claims before turning to whether genuine issues of material fact preclude summary judgment in FINO's favor.

### Hearing Statement

Ovation contends that the district court erred when it relied on Plaintiffs' counsel's statement at the summary judgment hearing to narrow the scope of the

case to the loss of a single embryo in March 2017.

*Scope of Petition*

The question of whether Plaintiffs' claims were narrowed at the hearing must begin with an examination of what the petition itself placed at issue. Plaintiffs' petition asserts four theories of negligence against both FINO and Ovation. Three of those allegations are framed in terms of Plaintiffs' "embryos" in the plural, including claims that defendants failed to properly store or cryopreserve the embryos, negligently handled, packaged, or shipped the embryos, and failed to institute proper procedures or protocols in the embryology laboratory to prevent the loss or destruction of human embryos. Only one allegation, asserting the negligent loss of Plaintiffs' "embryo", appears in the singular form.

Read as a whole, the petition consistently alleges negligence as to Plaintiffs' embryos and broadly challenges the manner in which those embryos were handled and safeguarded. As noted, the petition alleges failures in storing, cryopreserving, handling, packaging, shipping, and safeguarding Plaintiffs' embryos and in maintaining proper procedures to prevent loss or destruction of "human embryos." These allegations are not confined to the March 2017 event. They encompass FINO's conduct throughout the course of Plaintiffs' IVF treatment, including its handling of the first six embryos rendered unusable for surrogate transfer.

Plaintiffs never filed a formal amendment narrowing these allegations, nor did FINO move to strike or limit them. Also, the district court did not issue a pretrial order redefining or restricting the scope of the pleadings. Under the Code of Civil Procedure, a petition remains the operative pleading until it is amended in accordance with La. C.C.P. arts. 1151-55 or narrowed by a specific court order. No such amendment or order occurred in this case. Accordingly, the petition, on its

face, continued to assert negligence claims relating to the handling and safeguarding of all of Plaintiffs' embryos, not solely the single embryo associated with the 2017 thaw.

*Plaintiffs' Motion to Adopt Ovation's Opposition*

The scope of Plaintiffs' claims is further illuminated by their motion to adopt in part Ovation's opposition to summary judgment, which confirms the theories of negligence Plaintiffs set forth in the petition. Plaintiffs filed a motion expressly adopting Ovation's opposition to FINO's motion for summary judgment "insofar as Ovation's arguments relate to Plaintiffs' claims against FINO as stated in Plaintiffs' Petition for Damages," and specifically identified all four theories of negligence from the petition. Ovation's opposition, in turn, challenged FINO's conduct across the entire course of treatment, including FINO's handling of the first six embryos and its failure to comply with FDA screening requirements.

Plaintiffs' written filing is a contemporaneous and formal indication of the scope of their claims, tied directly to the petition's broad allegations. That formal adoption cannot be overridden by an oral remark made during argument, particularly where the remark is equivocal. The significance of that statement is addressed next.

*Judicial Confession*

FINO's position, adopted by the district court, that Plaintiffs' counsel's oral statement narrowed the case to the 2017 embryo loss rests implicitly on the doctrine of judicial confession.

A judicial confession is "a declaration made by a party in a judicial proceeding" that "constitutes full proof against the party who made it." La. C.C. art. 1853. To have that effect, the statement must be an express, unequivocal

8

admission of an adverse fact, made with intent to bind the party as to the subject of the admission. *Federal Work Ready, Inc., v. Wright*, 19-0752, p. 16 (La. App. 4 Cir. 4/22/20) 299 So.3d 140, 149-50 (citing *Cichillo v. Avondale Industries, Inc.*, 04-2894, p. 6 (La. 11/29/05), 917 So.2d 424, 428-29).

Plaintiffs' counsel's statement does not meet that standard. Counsel first stated that FINO's liability for directing Plaintiffs away from the first six embryos was "not a claim my clients are making in their principal demand," but immediately followed by stating that Plaintiffs were "only adopting [Ovation's] opposition to the extent that they're pointing…the finger at FINO with respect to the loss…." Notably, Ovation's "finger-pointing" encompassed FINO's conduct well beyond the 2017 event, including its regulatory decisions concerning the first six embryos. Critically, Ovation's opposition was informed by evidence of FINO's alleged negligence at multiple stages of the embryo cryopreservation process, not merely the 2017 loss. That evidence, spanning FINO's regulatory decisions, handling procedures, and oversight across all stages of the process, would permit a jury to reasonably infer that FINO's negligence caused the loss of not only the 2017 embryo but also the initial set of embryos. By adopting that opposition, Plaintiffs necessarily brought that broader theory of negligence before the court. The two parts of counsel's statement thus pull in opposite directions. Coupled with counsel's own characterization of the issue as "confusing," the statement cannot be fairly construed as a clear, deliberate, and unequivocal renunciation of claims already asserted in the petition and reaffirmed in its motion adopting, in part, Ovation's opposition.

Moreover, no formal steps followed the hearing to memorialize any purported abandonment. There was no amended petition filed, no joint stipulation

9

made, and no client acknowledgment placed on the record.[2] Under these circumstances, we decline to treat counsel's ambiguous oral statement as a judicial confession that retroactively limits Plaintiffs' claims or extinguishes claims plainly set forth in the pleadings and preserved in their written filing.

Because the district court's narrowing of Plaintiffs' claims flowed from a misapplication of the law governing judicial confession and the rules governing pleadings, it constitutes a legal error. Accordingly, Plaintiffs' claims as set forth in the petition remain intact for purposes of the summary judgment analysis that follows in this opinion. However, even if we were to assume a valid judicial confession existed, a conclusion we do not reach, that confession would not operate to extinguish Ovation's independent cross claims against FINO.

*Ovation's Cross Claim*

A judicial confession binds only the party who makes it. La. C.C. art. 1853. Ovation was not a party to counsel's statement, made no similar concession, agreed to no such limitation, and did not suggest at the hearing its cross claims should be confined to the 2017 embryo loss. Ovation consistently maintained that FINO's liability extended across the full course of Plaintiffs' treatment and asserted that position in both its cross claims and its opposition to summary judgment.

Ovations' cross claim asserted five specific theories of negligence directed at FINO's handling of Plaintiffs' embryos:

a. Failing to properly retrieve [P]laintiffs' embryos;
b. Failing to properly store and/or cryopreserve the [P]laintiffs' embryos;

---

[2] The record is unclear as to whether the Gignilliats were present in court at the summary judgment hearing.

c. Failing to have properly trained embryologists or lab technicians to handle, manage, and preserve embryos in Cryotip Packaging;

d. Negligently handling the [P]laintiffs' embryos in Cryotip Packaging; and

e. Failing to institute proper procedures or protocols in the embryology laboratory to prevent the loss or destruction of human embryos frozen in Cryotip Packing[sic].

Plaintiffs' petition framed FINO's negligence broadly, referring to the storage, handling, and loss of embryos generally and encompassing conduct across the full course of treatment at FINO's facility. Ovation's cross claim is focused differently. It targets FINO's specific conduct with respect to Cryotip packaging, including the retrieval and loading of the embryo into that device, and the training and protocols governing that process. Theories (c), (d), and (e) in particular address the separate question whether FINO had adequately trained personnel and appropriate procedures for the technically demanding task of handling embryos in Cryotip devices.

These allegations speak directly to the condition of the embryo and whether it was properly loaded into the Cryotip before it left FINO's facility. They do not depend on what occurred at Ovation during the thawing process. They rest on a separate factual and legal footing and were asserted by Ovation in its own right, not as a mere extension of Plaintiffs' claims. By statute, a judicial confession "constitutes full proof against the party who made it" and no one else. La. C.C. art. 1853. A declaration by one party's attorney therefore cannot extinguish the independently asserted, separately pleaded claim of another party.

FINO contends that, even if Ovation's cross claim survives any judicial confession by Plaintiffs as a formal matter, the cross claim is nevertheless moot if Plaintiffs' principal demand fails. FINO relies on *McCrea v. Mobil Oil Corp.*, 95-0537 (La. App. 4 Cir. 9/28/95), 662 So.2d 143, for the proposition that a cross

11

claim for contribution or indemnity may become moot when the plaintiff's claim against the cross claimant is unsuccessful.

This argument is unpersuasive. First, as discussed above, Plaintiffs' claims against FINO have not been properly limited or dismissed. The broad allegations in the petition remain operative, and Plaintiffs' claims against FINO remain viable. The premise that there is no principal demand to support a cross claim is therefore incorrect.

Second, and more fundamentally, Ovation's cross claim is not a derivative contribution or indemnity claim of the type addressed in *McCrea*. Procedurally, *McCrea* addressed the question of proper relief following a successful venue exception, resulting in a dismissal without prejudice that left the main defendant free to refile its cross claim in the proper court. The main defendant in that action lost nothing permanently. In the case *sub judice*, FINO seeks a dismissal on the merits through summary judgment, which would extinguish Ovation's cross claim entirely and foreclose any future avenue of relief against FINO.

The substantive distinction is equally significant. In *McCrea*, this Court found no prejudice because the non-party defendant's fault would still be quantified at trial, giving the main defendant a meaningful opportunity to reduce its own liability. *Id.*, 95-0537, pp. 10-11, 662 So.2d at 149-50. That reasoning does not translate here. Ovation maintains that questions exist as to whether the embryo was properly handled, documented, and transferred before it reached Ovation's facility. If FINO is dismissed, Plaintiffs will naturally focus their claims on the only remaining defendant, leaving Ovation to defend against those claims without the ability to fully present FINO's independent role in the events at issue. Ovation would also lose any opportunity to place before the factfinder FINO's earlier

regulatory failures, which bear on the full scope of Plaintiffs' damages and the options that were foreclosed to them long before the 2017 transfer. Those are questions that warrant full litigation on the merits. Unlike the cross claimant in *McCrea*, Ovation would be left with no forum and no remedy for claims that are entirely its own. That is the prejudice *McCrea*'s reasoning was intended to prevent.

It is because those questions remain unresolved that we examine whether the record presents genuine issues of material fact that preclude summary judgment of Plaintiffs' claims and Ovation's cross claims.

**Summary Judgment**

The central question presented is who bears responsibility for extinguishing Plaintiffs' reproductive options. The record, as outlined below, reveals that to answer this question a series of unresolved factual disputes regarding what happened, when it happened, at whose hands, and what opportunities were lost along the way, are within the province of a jury and not the court ruling on summary judgment.

*FINO's Handling of the First Six Embryos*

Ovation contends that genuine issues of material fact exist as to FINO's handling of the first six embryos it cryopreserved. Specifically, Ovation avers that FINO failed to perform FDA-required infectious disease screening prior to cryopreserving the first six embryos in June 2014, rendering those embryos ineligible for transfer to a gestational surrogate. The contested questions are whether FINO's response to that failure breached the standard of care and whether that conduct caused compensable harm to Plaintiffs.

Ovation's expert, Dr. Amber R. Cooper, a board-certified obstetrician-gynecologist and reproductive endocrinologist, testified regarding the standard of

care applicable to the handling and disposition of Plaintiffs' embryos following FINO's failure to perform the required infectious disease screening before cryopreservation. It is undisputed that Plaintiffs had a clear plan to use a gestational carrier when they presented to FINO for IVF services. In her affidavit, Dr. Cooper stated that "if a patient is using a gestational carrier, sperm and eggs have to be tested" and "[i]nfectious disease labs must be drawn within 7 days before or after sperm is collected with an appropriate FDA Summary of Records ("SOR") form created to determine eligibility. The lab testing was never done by FINO."

Dr. Cooper explained that the initial screening failure rendered the first six embryos ineligible for transfer to a gestational surrogate absent further regulatory action. Dr. Cooper testified, however, that the available regulatory framework permitted FINO to report the non-compliance and seek an exemption from the FDA that could have allowed the embryos to be used with a surrogate. Nevertheless, as Dr. Cooper also explained, pursuing the exemption process could have subjected FINO to FDA scrutiny, including the possibility of inspection or enforcement action.

Dr. Cooper testified that, based on the records and materials she reviewed, she saw no documentation indicating that Plaintiffs were informed of that option or otherwise advised of the regulatory basis for sidelining the first six embryos. Dr. Cooper testified that the medical records reflect only that Plaintiffs were offered a complimentary second egg retrieval cycle.

In Dr. Cooper's opinion, the absence of documentation reflecting disclosure of the available regulatory pathway raised questions as to whether Plaintiffs were adequately informed of their options before the first set of embryos was effectively

14

removed from consideration for surrogate transfer. Dr. Cooper noted that "rather than describing its error in failing to comply with FDA regulations, FINO may have suggested that [Plaintiffs] reject the good quality [embryos] due to the question of the CMV IgM[3] elevation in Mr. Gignilliat's [semen] that was not properly addressed." Still, Dr. Cooper stated that CMV, standing alone, "would not have been the reason to discard the embryos." Dr. Cooper also questioned the timing and content of the CMV disclosure to Plaintiffs. In her view, "[t]he "theoretic[al] risk of CMV exposure did not arise until after the embryos were created and FINO realized appropriate FDA procedures were not followed."

The jury could infer from this testimony that any genuine concern about CMV exposure should have been addressed through appropriate testing prior to embryo creation, rather than by raising the CMV issue only after the fact as a reason to sideline the first six embryos. That inference is strengthened by what a jury could reasonably understand about the nature of IVF treatment itself. Eggs and sperm are finite and often scarce resources, and the standard practice of fertility medicine is built around conserving and maximizing every viable reproductive opportunity a patient has. A jury could find it difficult to reconcile a genuine concern about CMV exposure with the decision to proceed with fertilization in the first place, particularly where raising the concern after embryo creation meant irreplaceable materials had already been expended.

Additionally, the jury could infer that FINO's decision to avoid the exemption process, without clear evidence that Plaintiffs were advised of that alternative, impaired Plaintiffs' ability to make an informed decision about whether

---

[3] Testimony noted that "CMV" refers to cytomegalovirus, and "IgM" refers to immunoglobin M antibodies.

and how to continue using those embryos. Taken together, Dr. Cooper's opinions and the undisputed regulatory non-compliance support a reasonable inference that FINO's choices regarding the first six embryos breached the standard of care and caused Plaintiffs to proceed with fewer viable embryos than they otherwise might have had. This is not a loss that manifested through physical destruction or mishandling in the laboratory. It is an administrative loss, one caused by the failure to test before fertilization and the failure to pursue an available regulatory exemption afterward that effectively removed six embryos from Plaintiffs' reproductive options without their full and informed participation. That loss is distinct from, but directly connected to, the physical loss of the 2017 embryo that forms the other central claim in this litigation. Both the petition and Ovation's cross claims encompass these theories, and both find support in this record. Whether FINO's conduct caused or contributed to either loss, and in what measure, are questions of fact and causation that a jury must determine and cannot be resolved as a matter of law on summary judgment.

*Disclosure to Plaintiffs*

Dr. Cooper's testimony also highlights a related factual question as to what Plaintiffs were told about the status of the first six embryos and the options available to them. As discussed above, Dr. Cooper testified that she was unaware of any evidence in the materials she reviewed that Plaintiffs were informed of the regulatory non-compliance. During Dr. Cooper's deposition, FINO's counsel asserted that Plaintiffs were aware of "an issue with the testing." However, FINO has not pointed to any deposition, affidavit, or other evidence demonstrating that Plaintiffs knew that the embryos were sidelined because of FINO's failure to comply with FDA requirements, as opposed to a purely clinical concern. On this

16

record, whether and when Plaintiffs learned the true reason that their first six embryos were unavailable remains unresolved.

Resolution of that disputed fact bears directly on issues of causation, damages, and comparative fault. It affects whether Plaintiffs knowingly accepted FINO's proposed course of action or whether they were deprived of a meaningful opportunity to make informed decisions about the use of their embryos. Such questions cannot be decided on summary judgment.

*Causation for the 2017 Embryo Loss*

As to the single embryo that was to be transferred in March 2017, the evidence does not permit a definitive allocation of responsibility as a matter of law. The chain of custody ran from FINO, which loaded, sealed, labeled, and shipped the Cryotip, to Ovation, which received, stored, and thawed the device. When Ovation opened and flushed the Cryotip, no embryo was found, and there was no physical evidence that an embryo had ever been present in the device.

Plaintiffs' expert, Dr. Barry Behr, opined that the loss likely occurred during the thawing process at Ovation and identified where potential procedural errors can happen, including possible leakage and use of an alternative syringe, as well as concerns about the embryologist's training. His analysis, however, presumes that the embryo was present in the Cryotip when it arrived at Ovation. Ovation asserts, this is an assumption that the physical evidence does not conclusively support.

Where Dr. Behr focused on the thawing procedure and embryologist training, Ovation's expert, Dr. Cooper, by contrast cited "limitations" in FINO's documentation of each step in the preparation, packaging, handling, shipping, and transport of the embryos. She explained that when an embryo is not recovered it may be lost or damaged at multiple points, due to embryo quality, damage

17

sustained when cells are removed from the embryo for genetic screening[4], loss in cryopreservation, transport-related temperature changes, or loss at thaw. In particular, she noted FINO's lack of documentation confirming the safeguard device designed to detect harmful temperature exposure during transport had been activated.[5] She further observed that the deposition testimony offered no meaningful clarification on that point, leaving the question of the embryo's condition during transport unresolved. In her view, Dr. Cooper concluded that it is "impossible to opine that it is somehow more likely" that the embryo was lost at the time of thaw, as suggested by Dr. Behr, because "the embryo could have disintegrated or been lost in many steps along the way."

The evidence before us does not permit a definitive allocation of responsibility as a matter of law, such that FINO should be dismissed on summary judgment. Based on the expert testimony, a reasonable jury could conclude that neither expert can say, with any greater degree of certainty than the other, at what point the embryo was lost. Both experts opine to where errors tend to occur. A reasonable jury could draw competing inferences from the expert testimony. On one hand, the jury may infer that the error occurred during Ovation's thawing procedure and was the result of inadequate training. On the other hand, the jury could infer that lapses in accurate documentation and adherence to protocol were not isolated to a single event, but reflected a broader problem for FINO, ranging from the mislabeling of the first six embryos for intimate partner use to the poor

---

[4] The opinion paraphrases this testimony for clarity; verbatim, Dr. Cooper stated: "damage at the time of the trophectoderm biopsy."

[5] The opinion paraphrases this testimony for clarity; verbatim, Dr. Cooper stated: "[t]here are limitations in the documentation…including the lack of documentation of activation of the Cryoguard in transport which is not well addressed in the depositions."

documentation Dr. Cooper observed in the overall handling and transport of Plaintiffs' embryos, and the absence of any notation in the medical records that Plaintiffs were advised of the exemption pathway or the true reason the first set of embryos was sidelined. Where there is competing expert testimony about the chain of custody and unresolved questions about the adequacy of documentation and adherence to proper protocols at multiple stages, determining what occurred and making necessary witness credibility determinations are the hallmark functions of the factfinder and cannot be resolved on summary judgment.

*Comparative Fault*

Louisiana's comparative fault regime, embodied in La. C.C. art. 2323, requires a factfinder to allocate fault among all persons whose negligence contributed to the plaintiff's harm. This principle applies with particular force in multi-actor cases involving sequential custody or handling of a critical item, where each party's conduct must be assessed in context to ensure a fair and complete allocation of responsibility. *See Malta v. Herbert S. Hiller Corp.*, 20-0250, p. 16 (La. App. 4 Cir. 11/25/20), 365 So.3d 123, 135 (emphasizing that comparative fault contemplates consideration of all potentially liable parties by the factfinder).

In this case, FINO had custody of the embryos from creation and cryopreservation through packaging and shipment to Ovation, during which time it made decisions that limited Plaintiffs' reproductive options. Ovation assumed custody upon receipt and retained it through storage and thawing. The embryo disappeared somewhere along this chain, and the record neither eliminates FINO as a potential source of the loss or absolves Ovation. Dismissing FINO at summary judgment would deny Plaintiffs and Ovation access to a full airing of their claims before a jury and deprive the factfinder of the opportunity to evaluate the entirety

19

of the evidence, including FINO's role in the chain of custody and its earlier regulatory decisions. Comparative fault jurisprudence guards against such truncated proceedings, ensuring that no potentially responsible party is prematurely removed from the case. *See Nowell v. State Farm Mut. Auto. Ins. Co.*, 576 So.2d 77, 82 (La. App. 2 Cir. 1991) (emphasizing "[t]he purpose of assessing fault against all persons whose fault contributes to an injury to a non-negligent plaintiff is to allow the faulty parties to apportion and claim contribution between themselves….").

Appellate courts have long held that where causation and relative fault are at issue, as they are here, summary judgment in favor of any defendant is improper. *See generally Malta,* 20-0250, p. 16, 365 So.3d at 135; *Guilbeau v. Liberty Mut. Fire Ins. Co.*, 18-230, p. 13 (La. App. 3 Cir. 3/7/19), 269 So.3d 1002, 1010 ("Because allocation of fault is a factual finding, where reasonable minds can differ about the allocation of fault to each party, summary judgment is inappropriate and comparative fault applies."); *Thomas v. BNSF Ry. Co.*, 23-1209, p. 7 (La. App. 1 Cir. 8/21/25), 420 So.3d 732, 739-40 ("A jury, as the trier of fact, must consider both the nature of the conduct of each party and the extent of the causal relation between the conduct and the damages claimed in order to determine comparative fault."). The appropriate course is reversal and remand for trial, preserving a plaintiff's right to a complete adjudication of their claims by the factfinder best equipped to weigh the evidence and apportion fault. The same result is warranted here.

## CONCLUSION

For these reasons, we find the district court committed legal error in treating Plaintiffs' counsel's oral statement as a judicial confession narrowing Plaintiffs'

claims and extinguishing Ovation's cross claims, and that genuine issues of material fact preclude granting summary judgment in FINO's favor as to all claims.

<strong>DECREE</strong>

Accordingly, the June 5, 2025 judgment of the district court granting FINO's motion for summary judgment and dismissing Plaintiffs' claims and Ovation's cross claims with prejudice is reversed, and the matter is remanded to the district court for trial on the merits.

<strong>REVERSED AND REMANDED</strong>